# EXHIBIT 1

| CIVIL ACTION COVER SHEET | TRIAL COURT OF MASSACHUSETTS SUPERIOR COURT DEPARTMENT COUNTY OF MIDDLESEX | DOCKET NO. 15-194 7 |
|---|---|---|

| PLAINTIFF(S) JOSE SILVA and CARLOS SANTOS Individually and on Behalf of Class Members | DEFENDANT(S) DFRF ENTERPRISES, LLC, et al. |
|---|---|

| Plaintiff Atty Evans J. Carter, Esq. | Type Defendant's Attorney Name |
|---|---|
| Address P.O. Box 812 | Defendant Atty |
| | Address |
| City Framingham State MA Zip Code 01701 | City State Zip Code |

| Tel. +1 (508) 875-1669 | BBO# 076560 |
|---|---|

**TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| B04 Other Neglience - Personal Injury/Property Damage - Fast Track | | | [X] ] Yes [ ] No |

The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

**TORT CLAIMS**
(Attach additional sheets as necessary)

FILED
THE OFFICE OF THE
CLERK OF COURTS
FOR THE COUNTY OF MIDDLESEX

JAN 20 2015

CLERK

A. Documented medical expenses to date:
1. Total hospital expenses   $_____
2. Total doctor expenses   $_____
3. Total chiropractic expenses   $_____
4. Total physical therapy expenses   $_____
5. Total other expenses (describe)   $_____
   Subtotal $_____

B. Documented lost wages and compensation to date   $_____
C. Documented property damages to date   $_____
D. Reasonably anticipated future medical expenses   $_____
E. Reasonably anticipated lost wages and compensation to date   $_____
F. Other documented items of damages (describe)   $_____

G. Brief description of plaintiff's injury, including nature and extent of injury (describe)

Total $_____

**CONTRACT CLAIMS**
(Attach additional sheets as necessary)

Provide a detailed description of claim(s):

| Pyramid/Ponzi Scheme | Over $10,000,000 TOTAL $.......... |
|---|---|

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."

Signature of Attorney of Record _____   Date: 1/20/15

A.O.S.C. 3-2007

## COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION NO.15- _194_

FILED
IN THE OFFICE OF THE
CLERK OF COURTS
FOR THE COUNTY OF MIDDLESEX

JAN 2 0 2015

CLERK

JOSE SILVA and CARLOS SANTOS,
Individually and on Behalf of Class Members,

Plaintiff,

v.

DFRF ENTERPRISES, LLC, DANIEL
FERNANDES ROJO FILHO, A/K/A DANIEL
FILHO, DANIEL SOARES FILHO,
DANIEL MALAQUIN FILHO, DANIEL R.
POST FILHO and other names, and
VELITON MARCUS PEREIRA, JAIME DE
JESUS DE CAREY, GASDEN C. JESUS,
DANIEL FERNANDES, MARIO A.
RODRIGUEZ FERNANDES, PEDRO
BENEVIDES, BRITTANY BENEVIDES,
HERBERTO P. VALDES, JAVIER RIVERA
FERNDANDES, LUZIA MARIA
TRINNADE, WANDERLEY M. TALMAY,
EDWARD N. SILVA, ABDELBAKS
BANKS, ACCEDIUM UK, LIMITED,
CHARLES GEORGE NAPPER, MICHAEL
ANTHONY CHRISTOPHER ARMSTRONG,
ROMILDO DA CUNHO, RBS CITIZENS
BANK OF MASSACHUSETTS, N.A., JP
MORGAN CHASE BANK, N.A., WELLS
FARGO BANK N.A., and JOHN DOES 1-75,
Who Acted as Agents for DFRF Enterprises,
LLC.

Defendants.

**COMPLAINT, JURY CLAIM AND
REQUEST FOR CLASS ACTION
CERTIFICATION**

### 1. Introduction and Overview of Action

1.      The plaintiffs bring this action on behalf of themselves and on behalf of all others

similarly situated who reside within the Commonwealth of Massachusetts and who have

invested in DFRF Enterprises, LLC ("DFRF").  The plaintiffs have, respectively, invested $80,000 and $100,000 into DFRF.

2.      The defendants, jointly and severally, sold, marketed, advertised or aided and abetted in the sale of securities in the form of "memberships" in DFRF (a Florida/Massachusetts limited liability company), that promised substantial profits and a 15% annual return but was really only an outlawed pyramid/Ponzi scheme.

3.      The defendants, jointly and severally, managed, controlled, marketed and aided and abetted and continued enrolling new investors/members into DFRF.

4.      In October, 2014, the United States of America, in the U.S. District of the Middle District of Florida, Orleans Division, obtained judgments and orders against the assets of the defendant, Daniel Fernandes Rojo Filho.  Some of his assets in Florida and Arizona consisted of 294 Gold Bars, a Lamborghini exotic automobile and literally millions in other assets obtained from criminal enterprises.  Annexed hereto and marked as Exhibit A is a copy of the USA's Amended Verified Complaint for Forfeiture in that action.

5.      DFRF is a sham/fraud entity and its primary business is running a pyramid scheme that it had done in the State of Florida, starting in 2013, but has now moved its operation in Massachusetts.  DFRF tried to hook in Brazilian immigrants and minorities in Massachusetts to buy memberships, aided and abetted by Accedium UK Limited ("Accedium"), which issued issue bonds for investments but Accedium was barred from doing business in Malta and is merely a shell entity to assist DFRF.  Also, the bank defendants aided and abetted said scheme.

6.      Both DFRF and Accedium advertise over the Internet as being large successful enterprises but it is all false.

7.     An example of DRFR advertising in Portugese is annexed hereto and marked as Exhibit B.

8.     DRFR is a Pyramid/Ponzi scheme as defined by the U.S. Securities and Exchange Commission, a copy of which is annexed hereto and marked as Exhibit C.

## II. PARTIES

9.     The plaintiffs, Jose Silva and Carlos Santos, are individuals who both reside in Gloucester, Essex County, Massachusetts, and she paid $1,000 on or about October, 20014 for a $1,000 membership interest in DFRF.

10.     The defendant, DRFR, by the defendant, Daniel Fernandes Rojo Filho, was organized in Massachusetts as a limited liability company on or about July 21, 2014, with offices at 129 Concord Street, Suite 25, Framingham, Massachusetts, and at 60 State Street, Boston, Massachusetts. Mr. Filho described himself as a Brazilian billionaire, which is false (a copy of an Internet statement is annexed hereto and marked as Exhibit D. He also claimed that DFRF's primary business will be to buy and operate gold claims and mines, which is false.

11.     The defendant, Accedium UK Limited has been established as a U.K. Insurance company by its principal. The defendants, Charles George Napper and Michael Anthony Christopher Armstrong. Mr. Napper has also done business as Accedium Insurance Co., Ltd., and he falsely alleged that Accedium UK Limited was licensed by the UK Financial Services Commission which was false. Each of these defendants list their business address as being 148 Leadenhall Street, Stuart, London, EC3V4QT, United Kingdom. The Malta government has barred this defendant from doing business there since the insurance company was a scam so they moved to London.

12.     Veliton Marcus Pereira does business and has offices in Framingham, Massachusetts, as a manager of DFRF.

13.     Jaime De Jesus De Carey does business and has offices in Framingham, Massachusetts, as a manager of DFRF.

14.     Gasden C. Jesus does business and has offices in Framingham, Massachusetts, as a manager of DFRF.

15.     Daniel Fernandes does business and has offices in Framingham, Massachusetts, as a manager of DFRF.

16.     Pedro Benevides resides in the State of Florida and he does business as a principal of DFRF and he does business in Massachusetts.

17.     Brittany Benevides resides in the State of Florida and she does business as a principal of DFRF and she does business in Massachusetts.

18.     Herberto P. Valdes resides in the State of Florida and he does business as a principal of DFRF and he does business in Massachusetts.

19.     Luzia Maria Trinnade resides in the State of Florida and he does business as a principal in DFRF and he does business in Massachusetts.

20.     Edward N. Silva resides in the State of Florida and he does business as a principal in DFRF and he does business in Massachusetts.

21.     Abdelbaks Banks resides in the State of Florida and he does business as a principal in DFRF and he does business in Massachusetts.

22.     RBS Citizens Bank of Massachusetts, N.A., is a national bank with multiple offices in Framingham, Massachusetts. At all times material hereto, the defendant, RBS Citizens

-4-

Bank of Massachusetts, N.A., provided banking services, maintained accounts, received and executed transfers of funds for the benefit of DFRF and Mr. Filho.

23.     JP Morgan Chase Bank, N.A., is a national bank with offices at 41 First Avenue, Needham, Massachusetts.  At all times material hereto, the defendant, JP Morgan Chase Bank, N.A., provided banking services, maintained accounts, received and executed transfers of funds for the benefit of DFRF and Mr. Filho.

24.     Wells Fargo Bank, N.A., is a national bank with offices at 843 Worcester Street, Natick, Massachusetts.  At all times material hereto, the defendant, Wells Fargo Bank, N.A., provided banking services, maintained accounts, received and executed transfers of funds for the benefit of DFRF and Mr. Filho.  RSB Citizens Bank, N.A., JP Morgan Chase Bank and Wells Fargo Bank, N.A., are all hereinafter as "banking defendants."

## FACTS AND ALLEGATIONS

25.     On or about 2014, DFRF solicited the plaintiffs to buy a membership and they paid $80,000 and $100,000, respectively, to become members on or about October, 2014, and on or about November 12, 2014, the plaintiffs received an "Operating Agreement (Private Placement Memorandum), a copy of a form memorandum is annexed hereto and marked as Exhibit E.

26.     On page 33 of said Operating Agreement, DFRF, through Citizens Bank of Massachusetts, N.A., was to pay (variable) up to fifteen percent (15%) per year to the plaintiff.

27.     The plaintiffs also received form Certificates of Membership, a facsimile copy of which is annexed hereto and marked as Exhibit F and a bond issued by the defendant, Accedium UK, Limited, a copy of which is annexed hereto and marked as Exhibit G.

28.     DFRF started in business in 2013 in the State of Florida but due in part to federal and state court actions and investigations, on or about July 21, 2014, it moved its office and base of operations to Framingham, Massachusetts, which town for Brazilians had become the headquarters for Ponzi/Pyramid schemes aimed at the Brazilian immigrant population in Massachusetts.

29.     DFRF maintains a website and advertises extensively to Brazilian nationals over the Internet and a sampling of such advertisements, almost all in Portugese, are annexed hereto and marked as Exhibit H.

30.     DFRF provided marketing materials on its website that its agents would download in order to recruit new members.

31.     To date, the DFRF scheme (Ponzi/Pyramid) has provided a 15% annual return on their investments but DFRF's business income was grossly inadequate to satisfy payments promised to members.

32.     It is believed in the last quarter of 2014, DFRF has been able to obtain tens of millions of dollars from Massachusetts residents into its Ponzi/Pyramid scheme.

33.     To drum up interest in DFRF, its founders and inside promoters also used videos on Adobe and other websites in which the defendant founders and inside promoters appeared and presented unfair, deceptive and false facts and advice to promote the DFRF membership and persuade others to join the pyramid scheme.

34.     DFRF and the its founders and inside promoters falsely claimed to be highly successful entrepreneurs.

35.     Filho, a self-proclaimed billionaire, had previously operated a similar Pyramid/Ponzi scheme in Florida from 2013 until he was shut down in 2014.

36.     Filho failed to advise Massachusetts memberships that the U.S. government in Florida obtained much of his assets that were obtained from criminal activity (See Exhibit A).

37.     Defendants (collectively, the "Defendant Founders") were responsible for the control and operation of DFRF in Massachusetts.

38.     DFRF founders were not only controlling the activities and operations of DFRF, but also knowingly and willfully conspired to perpetrate, and did perpetrate, the DRFR pyramid scheme with full awareness of its fraudulent and illegal nature.

39.     From August 2014 to date, the defendant, RSB Citizens Bank of Massachusetts, N.A., knowingly aided and abetted the unlawful, unfair and deceptive pyramid scheme and knowingly received and executed fraudulent funds' transfers and violated mandatory bank reporting any suspicious activities reporting and failed to even do a cursory due diligence as t o DRFR and its principals.

40.     Since RBS Citizens Bank of Massachusetts, N.A., prior to opening accounts and aided and abetted DFRF pyramid scheme, this bank had done the same type of activities in the DFRF Pyramid Scheme.

41.     The defendant, RBS Citizens Bank of Massachusetts, N.A., provided crucial financial services to the Defendant Founders, which enabled them to carry on its unlawful, unfair and deceptive pyramid scheme.

42.     The defendant RBS Citizens Bank of Massachusetts, N.A., assisted DFRF in the payment processing services and knowingly participated in and aided and abetted DFRF'S pyramid scheme by:

> a.  receiving transfers of funds from, and on behalf of, DFRF in DFRF's
>
>     fraudulent business, despite knowledge of the fraudulent nature of DFRF's

business enterprise;

b. processing payments to, and on behalf of, DFRF and its Founders and management, in DFRF's fraudulent business, despite knowledge of the fraudulent nature of DFRF's business enterprise;

c. transferring funds from and out of DFRF's accounts, despite knowledge of the fraudulent nature of DFRF's business enterprise and

d. otherwise enabling DFRF's Pyramid Scheme to expand and continue by providing necessary financial services to DFRF, despite actual knowledge of fraud by DFRF.

e. Transferring funds from DFRF's accounts to the founding defendants' individual accounts.

43.     Despite knowledge of the fraudulent nature of DFRF's business operations, RBS Citizens Bank, N.A., continued to provide DFRF with banking services.

44.     The defendant, RBS Citizens Bank of Massachusetts, N.A., is a "financial institution" under the terms of the Bank Secrecy Act, 31 U.S.C. § 5312, and it has internal controls and policies in effect to avoid aiding and abetting Ponzi/Pyramid schemes.

45.     The defendant, RBS Citizens Bank of Massachusetts, N.A., has an affirmative obligation to file Suspicious Activity Reports with the Financial Crimes Enforcement Network of the U.S. Department of the Treasury and other appropriate federal law enforcement agencies, pursuant to the terms of the Bank Secrecy Act and Regulations, 31 U.S.C. § 5312 and 12 CFR § 21.11.

46.     The defendant, RBS Citizens Bank of Massachusetts, N.A., is obligated by applicable federal statutes and regulations, including, without limitation, 31 C.F.R. § 103.121

-8-

(amended 31 C.F.R. § 1020, et seq.), to acquire information sufficient to know the true identities, nature of business activities, customer base, and product offerings of all entities to which it provides financial services or access to the national banking system.

47.     Pursuant to this required "know-your-customer" analysis, as required by 31 C.F.R. § 103.121 (amended 31 C.F.R. § 1020, et seq.), The defendant, RBS Citizens Bank of Massachusetts, N.A., was required to collect information sufficient for it to determine whether DFRF or any of its other customers involved with DFRF posed a threat of criminal or other improper conduct.

48.     The defendant, RBS Citizens Bank of Massachusetts, N.A., is also obligated by applicable federal statutes and regulations, including, without limitation, the Bank Secrecyy Act, 31 U.S.C. § 5311 et seq., the USA Patriot Act, § 326, 31 U.S.C. § 5318, and 31 C.F.R. § 1020 et seq., to implement effective procedures to prevent such Defendant from providing financial services or access to the national banking system, to entities engaged in illegal activities.

49.     The defendant, RBS Citizens Bank of Massachusetts, N.A., also knowingly, or with willful ignorance, failed, refused or neglected to perform proper "know-your-customer" analysis with respect to DFRF, the Defendant Founders and the Defendant Named Inside Promoters and Do Inside Promoters, as required by C.F.R. § 103.121 (Amended 31 C.F.R. § 1020, et seq.

50.     Furthermore, the defendant, RBS Citizens Bank of Massachusetts, N.A., failed, refused or neglected to implement effective policy and procedures to prevent such defendant from providing financial services and access to the national banking system to DRFR, the Defendant Founders, and the Defendant Named Inside Promoters, Agents and John Doe Inside

Promoters, as required by the Bank Secrecy Act, 31 U.S.C. § 5311 et seq.; the USA Patriot Act, § 326, 31 U.S.C. § 5318; and 31 C.F.R. § 1020 et seq.

### John Doe Inside Promoters who Acted as DRFR Agents

51.     Although they remain unknown to plaintiffs and the Putative Class Representatives and will remain unknown until discovery has been exchanged, certain promoters were provided with inside information by defendants and acted as agents and servants of defendants.

52.     The plaintiffs and the Putative Class Representatives seek to obtain damages, restitution and injunctive relief for the Class, as defined, below, from defendants.

## IV. CLASS ACTION ALLEGATIONS

53.     Under Rule 23 of the Massachusetts Rules of Civil Procedure, the plaintiffs sue on their own behalf, and on behalf of all other persons similarly situated ("the Class").  The Class that Plaintiffs seek to represent is: All persons residing in the Commonwealth of Massachusetts who purchased membership interests in DFRF.

54.     Plaintiffs meet the requirements of Massachusetts Rules of Civil Procedures 23(a) because the members of the Class are so numerous that the joiner of all members is impractical. While the exact number of Class members is unknown to Plaintiffs based on information and belief, it is in the hundreds of thousands.

55.     The Massachusetts Superior Court has the authority and proper venue to hear a so-called G.L. Chapter 93A class action such as this.

56.     The plaintiffs meet the requirements of Massachusetts Rules of Civil Procedure 23(a) because the members of the class are so numerous that the joiner of all members is impractical.  While the exact number of class members is unknowns to the plaintiffs based on

information and belief, it is in the thousands, with many millions of dollars paid for DFRF's membership interest.

57.    The plaintiffs meet the requirements of Massachusetts Rules of Civil Procedure 23(a) because there is a well-defined community of interest among the members of the class, common questions of law and fact predominate, plaintiff's claims are typical of the members of the class, and plaintiffs can fairly and adequately represent the interests of the class.

58.    This action satisfies the requirements of Massachusetts Rule of Civil Procedure 23(b)(3) because it involves questions of law and fact common to the member of the class that predominate or questions affecting only individual members, including, but not limited to:

   a.  whether DFRF ran an unlawful Pyramid Scheme or a legitimate business;

   b.  whether DFRF ran a lawful Multi-Level Marketing program;

   c.  whether defendants knew that DFRF was an illegal pyramid scheme, continued to aid, abet and further such illegal activities or are otherwise liable for the economic loss suffered by the Putative Class;

   d.  whether the banking defendants knowingly aided and abetted DFRF's Pyramid Scheme;

   e.  whether Massachusetts' Unfair Trade and Deceptive Acts, M.G.L. c. 93A will apply to the claims of the Putative Class;

   f.  whether Massachusetts' Blue Sky Laws will apply to the claims of the Putative Class;

   g.  whether certain defendants used and employed manipulative and deceptive devices and contrivances in violation of MGL 110A, Sec. 410; used means and instrumentalities, directly and indirectly, for the purchase and sale of

-11-

unregistered securities; and used and employed manipulative and deceptive
devices and contrivances in violation of the Massachusetts Uniform Securities
Act, MGL c. 110A, Section 410(b) and MGL 93A;

h.   whether DFRF defendants violated Section 1965 of the Racketeer Influenced
and Corrupt Organizations Act [18 U.S.C. § 1965];

i.   whether DFRF mailed fraudulent and inaccurate forms to investors;

j.   whether the defendants' conduct violated any of the articulated Massachusetts
state common laws; and

k.   whether the plaintiffs and the class are entitled to damages, civil penalties,
punitive damages, and/or injunctive relief.

59.   The plaintiffs' claims are typical of those of other class members because
plaintiffs was defrauded by defendants' scheme.

60.   The plaintiffs will fairly and accurately represent the interests of the Class.

61.   The prosecution of separate actions by individual members of the Class would
create a risk of inconsistent or varying adjudications regarding individual members of the class,
which would establish incompatible standards of conduct for the Defendants and would lead to
repetitive adjudication of common questions of law and fact.

62.   Class treatment is superior to any other method for adjudicating the controversy.
Plaintiffs know of no difficulty likely to be encountered in the management of this litigation that
would preclude its maintenance as a class action under M.R.C.P. No. 23(b)(3).

63   Damages for any individual class member likely cannot justify the cost of
individual litigation, so that absent class treatment, the defendants' violations of law inflicting
substantial damages in the aggregate would go un-remedied without certification of the Class.

64      Defendants have acted or refused to act on grounds that apply to the class, as alleged above, and certification is proper under Rule 23(b)(2).

## V.  CLAIMS FOR RELIEF

### COUNT I

**(Violations of Massachusetts General Laws, Chapter 93A, Sections 2 and 11)**

The plaintiffs incorporate by reference all allegations in all previous paragraphs, as though fully set forth here.

65      The defendants were engaged in "trade" and "commerce" as defined by Massachusetts General Laws Chapter 93A, Section 1.

66      The plaintiffs and the Putative Class were engaged in "trade" and "commerce" as defined by Massachusetts General Laws Chapter 93A, Section 1.

67.     The foregoing transactions, actions and inactions of defendants constitute unfair and deceptive acts and practices as defined by, and in violation of, Massachusetts General Laws, Chapter 93A, §§ 2 and 11.

68.     In consequence of defendants' unfair and deceptive acts and practices, Plaintiffs and the Putative Class have suffered great financial losses, and have also incurred considerable expenses and loss of income, and have otherwise been greatly damaged.

### COUNT II

### (Negligence)

The plaintiffs incorporate by reference all allegations in all previous paragraphs, as though fully set forth here.

-13-

69.     The defendants owed a duty to plaintiffs and the Putative Class to act with a level of reasonable care to avoid misstating, misrepresenting or being misleading about the true nature of DRFR's operation and its financial information or its returns, and to comply with all laws.

70.     By misstating and omitting relevant information, including the source of and sufficiency of funds for payments to promoters, defendants breached their duty of care owed to plaintiffs and the Putative Class.

71.     The banking defendants failed to monetary the DFRF accounts, inquire further and to take reasonable steps to prevent a diversion of funds or perpetration of a fraudulent scheme.

72.     The plaintiffs and the Putative Class relied upon Defendants' expertises and/or performance of their duties in becoming promoters for the pyramid scheme.

73.     The plaintiffs and the Putative Class reposed faith, confidence and trust in defendants' representations and advice.

74.     As a direct and proximate result of defendants' negligence and carelessness, plaintiffs and the Putative Class have been caused to suffer and sustain damages and losses.

## COUNT III

### (Negligent Misrepresentation)

The plaintiffs incorporate by reference all allegations in all previous paragraphs, as though fully set forth here.

75.     The defendants directly, and through their agents, servants, employees and/or representatives, negligently made false misrepresentations of material fact and omissions to plaintiffs and the Putative Class in the course of their businesses with the misrepresentations

being made to obtain and/or wrongfully appropriating and converting money from Plaintiffs and the Putative Class.

76.     The defendants made negligent misrepresentations and omissions although said defendants knew, or should have known, that such representations were false.

77.     Said representations and statements were material and were relied upon by the plaintiffs and the Putative Class, inducing them to furnish money to the defendants.

78.     In consequence of the reliance on the negligent misrepresentations of the said defendants, plaintiffs and the Putative Class have suffered great financial losses, have also incurred considerable expenses and loss of income, and have otherwise been greatly damaged.

## COUNT IV

### (Fraud)

The plaintiffs incorporate by reference all allegations in all previous paragraphs, as though fully set forth here.

79.     The defendants directly, and through their agents, servants, employees and/or representatives, did intentionally make false representations and omissions of material fact to plaintiffs and the Putative Class with these misrepresentations being made to obtain and/or wrongfully appropriating and converting money from Plaintiffs and the Putative Class.

80.     Said defendants' fraudulent misrepresentations and omissions are detailed above and include, but are not limited to:

a.      providing false and misleading information on the nature of DFRF's business operation;

b.      misrepresenting the financial statements;

c.      providing false and misleading information on the value of DFRF's assets;

-15-

  d. providing false and misleading information on the method and source from which income was derived;

  e. providing false and misleading information on the legality of DFRF's business model;

  f. providing false and misleading information on the sustainability of the returns to Promoter;

  g. providing false and misleading information regarding the investigation in DFRF's Brazil and Massachusetts operations;

  h. knowingly participating in false and deceptive information televised over the internet and other media;

  i. failing to comply with federal and state laws; and

  j. employing legal and accountant counsel to mask their illegal and fraudulent activities to further and perpetuate such illegal fraudulent activities.

81. Said defendants knew or should have known of the fraudulent and deceptive misrepresentations and omissions of material facts set forth.

82. Said defendants made these intentional misrepresentations although Defendants knew that such representations were false for the purpose of inducing Plaintiffs and the Putative Class to purchase initially and to continue to purchase memberships and to recruit new members.

83. Such misrepresentations and omissions were done knowingly for the additional purpose and effect of concealing the true information about the DFRF program, including its financial condition and operations.

84.     Said defendants received information reflecting the facts regarding DFRF's business practices and exercised control over the materially misleading misstatements.

85.     Because of their control over and/or association with the DFRF Program, said defendants were active and culpable participants in the fraudulent scheme.

86.     Said defendants knew and recklessly disregarded the false and misleading nature of the information they caused to be disseminated to promoters and potential promoters.

87.     The ongoing fraudulent Pyramid Scheme could not have been perpetrated without the knowledge and complicity of said defendants.

88.     These misrepresentations and statements were material and were relied upon by Plaintiffs as true, inducing them to furnish money, directly or indirectly, to said defendants and recruit new members.

89.     In consequence of the reliance on the intentional misrepresentations, plaintiffs and the Putative Class have paid artificially inflated prices for worthless membership interests, suffered great financial losses, and have also incurred considerable expenses and loss of income, and have otherwise been greatly damaged during the Class Period.

## COUNT V

### (Unjust Enrichment)

Plaintiffs incorporate by reference all allegations in all previous paragraphs, as through fully set forth here.

90.     Plaintiffs and the Putative Class furnished funds, directly or indirectly, to defendants, who accepted them without protest or defect and retained and benefitted from them.

91.     Defendants knew of such funds received by them.

-17-

92.     Defendants have unlawfully and in bad faith denied plaintiffs and the Putative

Class access to such funds, and have instead knowingly retained the benefit of such funds for

themselves.

93.     As a direct and proximate result of defendants' actions, as hereinabove set forth,

defendants are, and continue to be, unjustly enriched.

### COUNT VI

### (Tortious Aiding and Abetting)

Plaintiffs incorporate by reference all allegations in all previous paragraphs, as through

fully set forth here.

94.     Each defendant provided substantial assistance or encouragement to the other

defendants in committing the primary causes of action alleged herein, and did so with unlawful

intent and knowledge that such parties were perpetuating an illegal Pyramid Scheme yet

continuing to substantially assist or encourage.

95.     Defendants rendered this substantial assistance despite their knowledge that

DFRF's operations constituted an unlawful, unfair, deceptive and unsustainable Pyramid Scheme

and financial fraud.

96.     Such substantial assistance rendered by defendants despite their knowledge of, or

with reasonable diligence they should have known of, the illegal nature of DFRF's operations, is

detailed above and includes, but is not limited to:

> a.     managing and controlling DFRF and its affiliated entities;
>
> b.     providing banking, investment and asset management services for DFRF
>        and its management;
>
> c.     Promoting DFRF advertising materials; and

-18-

    d.    Processing payments to, from, and on behalf of DFRF and its affiliated entities.

97.    By each defendant's actions participating in the Pyramid Scheme, as alleged above, each said defendant aided and abetted the commission of the causes of action alleged herein.

98.    As a direct and proximate result of DFRF's illegal Pyramid Scheme and all the activities performed in connection therewith, to which defendants provided substantial assistance, plaintiffs and the Putative Class sustained damages and losses.

## COUNT VII

### (Civil Conspiracy)

Plaintiffs incorporate by reference all allegations in all previous paragraphs, as through fully set forth herein.

99.    The defendants agreed or commonly designed to engage in the unlawful Pyramid Scheme and further its activities.

100.    As detailed above, each of said defendants engaged in a tortious act in furtherance of the agreement or common design to engage in the lawful Pyramid Scheme.

101.    The defendants, for an unlawful purpose and using unlawful means, with the intent of so combining, unlawfully defrauded plaintiffs and the Putative Class out of funds.

102.    In consequence of the foregoing, plaintiffs and the Putative Class sustained damages and losses.

## COUNT VIII

### (Violations of RICO, 18 U.S.C. § 1962(b)(c)2(d))

Plaintiffs incorporate by reference all allegations in all previous paragraphs, as through fully set forth herein.

103.    Beginning in at least as early as July, 2014 and continuing thereafter to date, DFRF constituted an "enterprise" (the "DFRF Enterprise"), as defined in 18 U.S.C. § 1961(4).

104.    During or about the respective time periods, the DFRF Enterprise engaged in interstate and foreign commerce, and its activities have affected interstate and foreign commerce.

105.    Beginning in at least as early as July, 2014 and continuing thereafter to date, DFRF and the defendants, being persons or entities associated in fact with the DFRF Enterprise, conducted or participated, directly or indirectly, in the conduct of the DFRF Enterprise's affairs through a pattern of racketeering activity, as set forth below, in violation of RICO, 18 U.S.C. § 1962(c).

106.    Additionally, beginning in at least as early as July, 2014 and continuing thereafter to date, the defendants aided and abetted DFRF in its conduct described in the previous paragraph, through a pattern of racketeering activity, as set forth below, in violation of RICO, 18 U.S.C. § 1962(c).

107.    The RICO defendants are distinct from the DFRF Enterprise.  Each Defendant has performed particular racketeering acts, but each Defendant is a separate individual or entity from the DFRF Enterprise.

108.    One of the purposes of the pattern of racketeering was, through mail and wire fraud, and transportation and possession of converted funds to conduct the affairs, directly or

indirectly, of the DFRF Enterprise, or to aid and abet such conduct, and to further their own economic interests.

109.   The racketeering acts of mail and wire fraud and transportation and possession of converted funds also were part of the DFRF Enterprise's goal to (a) purchase DFRF memberships, (b) to recruit additional members, (c) promote the DFRF Program, and (d) join the Pyramid Scheme and cause others to join and to reap financial gains for themselves.

110.   The pattern of racketeering activity alleged herein is distinct from the DFRF Enterprise.

111.   The pattern of racketeering activity has included acts of mail and wire fraud and transportation and possession of converted funds, to wit:

112.   Beginning in at least July, 2014, for the purpose of executing the Pyramid Scheme to defraud, or to obtain money or property by means of false or fraudulent pretenses, representations or promises, as set forth above, DFRF unlawfully, willfully, knowingly and recklessly placed and caused to be placed in the United States mail, or took or received therefrom, or aided and abetted the placement or receipt of matters or things consisting of, among other things, DFRF products and literature, correspondence related to the DFRF Enterprise, promotional literature, brochures, money, and checks to plaintiffs and the Putative Class, in violation of 18 U.S.C. § 1341.  It was reasonably foreseeable that these mailings or receipts would take place in furtherance of the fraudulent Pyramid Scheme.

113.   Beginning in July, 2014, for the purpose of executing the Pyramid Scheme to defraud, or to obtain money or property by means of false or fraudulent pretenses, representations or promises, as set forth above, the defendants and others unlawfully, willfully, knowingly and recklessly have transmitted, caused to be transmitted, or aided and abetted the

transmission by means of wire, radio, television, or internet communications in interstate or foreign commerce, certain materials promoting and executing the Pyramid Scheme on Internet web sites, by facsimile and telephone, including promotional materials, registration information, product information and invoices, and the execution of the purchase of memberships by Plaintiffs and the Putative Class, in violation of 18 U.S.C. § 1343.

114.   In addition, the foregoing individuals and entities knowingly and recklessly placed or caused to be placed, or aided and abetted the placement, of these and other misleading information and material on websites on the Internet and sent these misleading materials through interstate or foreign wire communications.

115.   Beginning in July, 2014 and continuing thereafter to present, DFRF and the other defendants have transported, transmitted or transferred in interstate and/or foreign commerce money in excess of $5,000, knowing the same to have been stolen, converted and/or taken by fraud, in violation of 18 U.S.C. § 2314.

116.   Beginning in July, 2014 and continuing thereafter to present, DFRF and the other defendants possessed money of plaintiffs and the Putative Class in excess of $5,000, knowing the same to have crossed a State or United States boundary after being stolen, unlawfully converted, or taken, in violation of 18 U.S.C. § 2315.

117.   Each such offense has constituted a separate predicate act of racketeering, which has been part of the pattern of racketeering activity through which said Defendants conducted the affairs, directly or indirectly, of the DFRF Enterprise, or aided and abetted such conduct.

118.   The racketeering acts set forth below, and others all had the same pattern and similar purpose of defrauding plaintiffs and the Putative Class for the benefit of said Defendants.

119. More specifically, the conduct that comprised the racketeering includes, but is not limited to, all the acts alleged above, as well as the acts described below.

## Mail Fraud

120. The Pyramid Scheme was furthered by the use of the United States mail. DFRF and the defendants each had a specific intent to defraud by devising participating in or abetting the Scheme.

121. It was part of this pattern of racketeering activity that each said defendant committed various acts of mail fraud, as described in detail above in violation of 18 U.S.C. § 1341, thereby directly and foreseeably injuring plaintiffs and the Putative Class.

## Wire Fraud

122. The Pyramid Scheme was furthered by the use of interstate and international wire transmission facilities. DFRF and the defendants each had a specific intent to defraud by devising participating in or abetting the Scheme.

123. It was part of this pattern of racketeering activity that each said defendant committed various acts of wire fraud, as described in detail above in violation of 18 U.S.C. § 1343, thereby directly and foreseeably injuring plaintiffs and the Putative Class.

## Transportation and Possession of Stolen Property

124. Each of the defendants knew or recklessly disregarded that the proceeds obtained from the Promoters, as described in detail above, had been converted as of the time each was received into DFRF's and/or said defendants' accounts, because defendants knew that plaintiffs and the Putative Class had an immediate, superior right to possession or ownership of the funds and that the reception of such funds deprived plaintiffs and the Putative Class of their possessory or ownership interests in them.

-23-

125.   It was part of this pattern of racketeering activity, as described in detail above, that on multiple occasions said defendants transported, transmitted or transferred in interstate or foreign commerce money of a value in excess of $5,000, knowing the same to have been stolen, converted or taken by fraud, thereby directly and foreseeably injuring plaintiffs and the Putative Class, in violation of 18 U.S.C. § 2314.

126.   It was as part of this pattern or racketeering activity that each Defendant knew of the acts described in the previous paragraph, and knowingly and intentionally provided substantial assistance to DFRF, thereby directly and foreseeably inuring Plaintiffs and the Putative Class, in violation of 18 U.S.C. §§ 2 and 2315.

127.   Such illegal and wrongful behavior constitutes "racketeering activity" as defined by 18 U.S.C. 1961(1).

128.   Said defendants are associated with the DFRF Enterprise.

129.   In violation of 18 U.S.C. § 1962(c), said defendants conducted and/or participated in the conduct of the affairs of the DFRF Enterprise, including, but not limited to, participation in activities in furtherance of the Pyramid Scheme, through a pattern of racketeering activity.

130.   In engaging in the foregoing mail and wire fraud and transportation and possession of stolen property, said defendants knew plaintiffs and the Putative Class would reasonably rely on their representations and omissions which would result in plaintiffs and the Putative Class joining the fraudulent Pyramid Scheme.

131.   Said Defendants knew that the misrepresentations and omissions described above in promoting and executing the Pyramid Scheme were material because they caused plaintiffs and the Putative Class to join and participate in the illegal pyramid scheme.

132.   Had plaintiffs and the Putative Class known that said defendants were promoting a fraudulent pyramid scheme, they would not have joined it.

133.   Defendants' acts of mail and wire fraud and transportation and possession of stolen property were a proximate cause of injuries that plaintiffs and the Putative Class suffered.

134.   In consequence of said defendants' unlawful enterprise and pattern of racketeering activity plaintiffs and the Putative Class have suffered great financial losses, and have also incurred considerable expenses and loss of income, and have otherwise been greatly damaged.

## COUNT IX

### (Violations of Massachusetts General Laws, Chapter 110A, Section 410(b))

The plaintiffs incorporate by reference all allegations in all previous paragraphs, as through fully set forth herein.

135.   At the time of the wrongs alleged, the defendants were each a controlling person, partner, officer, director, person occupying a similar status, or employee materially aiding in the sale of securities, of DFRF within the meaning of Section 410(b) of the Massachusetts Uniform Securities Act, M.G.L. c. 110A.

136.   By their respective positions of authority, the defendants had the power and authority to influence and control, and influenced and controlled, the decision-making and activities of DFRF caused them to engage in the wrongful conduct described and violations of Section 410(a) of the Massachusetts Uniform Securities Act, M.G.L. c. 110A.

137.   The defendants actively participated in the leadership and decision-making process of the selling entity causing the dissemination of false and misleading statements and omissions of material facts.

-25-

138.    By their positions as controlling persons, partners, members and agents of DFRF, and because of the aforementioned conduct, said defendants are liable under Section 410(b) of the Massachusetts Uniform Securities Act, M.G.L. c. 110A.

139.    In addition, the defendants materially aided in the sales of the fraudulent securities in violation of Section 410(a) of the Massachusetts Uniform Securities Act, M.G.L. c. 110A.

140.    Said defendants made significant contributions toward making the sales to the plaintiffs and the Putative Class possible through their actions detailed above.

141.    Said defendants prepared and provided information on, endorsed and actively promoted the opportunity regarding the securities on websites and at DFRF events.  Each of the said defendants provided print materials, electronic materials, and made oral representations to the Putative Class

142.    The stated defendants are liable under 410(b) as a primary violation by DFRF was under 410(a), Defendants materially aided in the sale of unregistered securities, and knew, or by reasonable diligence should have known, of the primary violation.

143.    Said defendants are jointly and severally liable for the primary violations detailed under Section 410(a)(2) above.

144.    Plaintiffs and the Putative Class seek the award of actual damages on behalf of the Class.

## V.  PRAYERS FOR RELIEF

WHEREFORE, plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

1. Declaring this action to be a Class Action properly maintained under the Massachusetts Rules of Civil Procedure and certifying plaintiffs as the class representative;

2. Awarding plaintiffs and Class Members rescission and/or compensatory damages against Defendants for all damages sustained because of their wrongdoing, in an amount to be proven including interest;

3. For an award of actual damages, compensatory damages, statutory damages, punitive damages, and statutory penalties, in an amount to be determined;

4. For an award of punitive damages;

5. For an award of costs of suit and attorneys' fees, as allowable by law;

6. For an award of interest;

7. To appoint a receiver selected by Class Counsel and an accounting; and

8. For an award to plaintiffs and the Class of such other and further relief as may be just and proper under the circumstances including injunctive and equitable relief.

## DEMAND FOR JURY TRIAL

Plaintiffs and the Putative Class demand a jury trial of their claims to the extent authorized by law.

Respectfully submitted,

JOSE SILVA and CARLOS SANTOS, Individually
and on Behalf of Class Members, Plaintiffs

By their Attorney

Evans J. Carter, Esq. (BBO #076560)
Evans J. Carter, P.C.
860 Worcester Road, 2nd Floor
P.O. Box 812
Framingham, MA 01701
(508) 875-1669
ejcatty1@verizon.net

DATED:   January 12, 2015

## SCHEDULE OF EXHIBITS

A.   Complaint in U.S. District Court, Middle District of Florida, Orlando Division, Case No. 6:09-cv-1852-Orl-28GJK.

B.   DFRF Advertisement in Portugese.

C.   SEC Definition of Pyramid Scheme.

D.   Daniel Fernandes Rojo Filho's Internet Statement.

E.   Facsimile copy of Private Placement Memorandum/Operating Agreement.

F.   Facsimile copy of Certificate of Membership.

G.   Facsimile copy of Accedium UK, Limited Insurance Indemnity Bond.

### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

      **v.**                     **Case No. 6:09-cv-1852-Orl-28GJK**

**ASSETS DESCRIBED IN
"ATTACHMENT A" TO THE
VERIFIED COMPLAINT
FOR FORFEITURE IN REM,**

      **Defendants.**

### AMENDED VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

Plaintiff United States of America, by and through the undersigned Assistant

United States Attorney, brings this amended complaint and alleges upon information

and belief, in accordance with Supplemental Rule G(2), Supplemental Rules for

Admiralty or Maritime Claims and Asset Forfeiture Actions, as follows:

### NATURE OF THE ACTION

1.    This is a civil action *in rem* to forfeit to the United States, the following

assets:

    A.    Precious Metals

        1.    262 gold bars seized from Delaware Depository Service
            Company Custody Account #32648 held in the name of
            Pegasus Capital Corporation, located at 3601 North
            Market Street, Wilmington, DE, 19802 on February 9, 2009;
            and

        2.    32 gold bars seized from Inwood Security Vaults
            Custody Account held in the name of Pegasus Capital
            Corporation, located at 333 Inwood Village, Dallas, TX
            75209 on February 11, 2009.



EXHIBIT

*A*

B.   Vehicles

1.   2008 Black Chevrolet Suburban, VIN #3GNFC16008G186250, titled in the name of Javier Fernandez, seized on February 10, 2009 from 7350 Futures Drive, Orlando, FL;

2.   2008 Blue Chevrolet Corvette, VIN #1G1YY26E185118821, titled in the name of Angel Sanchez, seized on February 10, 2009 from 7350 Futures Drive, Orlando, FL;

3.   2008 Fleetwood Revolution Motorcoach, VIN #4VZBT1D908C065809, titled in the name of Luzia Trindade, seized on February 10, 2009 from 11953 W. Colonial Drive, Ocoee, FL;

4.   2008 Gray Nissan Armada, VIN #5N1BA08DX8N621236, titled in the name of Luiz Trindade, seized on February 10, 2009 from 2450 Dahlgren Way, Winter Garden, FL;

5.   2008 Dodge Charger, VIN #2B3LA73W88H151292, titled in the name of Luzia Trindade, seized on February 10, 2009 from 2450 Dahlgren Way, Winter Garden, FL;

6.   2008 White Chevrolet Equinox, VIN #2CNDL037X86296807, titled in the name of Cilmara A. Lourenco, seized on February 10, 2009 from 2450 Dahlgren Way, Winter Garden, FL;

7.   2008 Blue Lamborghini Murcielago, VIN #ZHWBU47S98LA02961, titled in the name of Skyview Aviation, seized on February 10, 2009 from 11953 W. Colonial Drive, Ocoee, FL;

8.   2009 White Audi R8, VIN# WUAAU34259N000746, titled in the name of Skyview Aviation, seized on February 10, 2009 from 11953 W. Colonial Drive, Ocoee, FL; and

9.   2009 Red Cadillac Escalade, VIN #1GYFK26289R117904, titled in the name of Luzia M. Trindade, seized on January 8, 2010 from 2450 Dahlgren Way, Winter Garden, FL.

C.     Financial Accounts:

    1.    Approximately $358,959.81 seized from SunTrust Bank Account #1000083744432, held in the name of Luzia Maria Trindade, Sabrina Trindade Zanchet, and Gabriel Trindade on September 16, 2009;

    2.    Approximately $11,590.19 seized from SunTrust Bank Account #1000083744424, in the name of Luzia Maria Trindade on September 16, 2009;

    3.    Approximately $346,495.44 seized from SunTrust Bank Account #1000083744440, in the name of Sabrina Trindade Zanchet on September 16, 2009; and

    4.    Approximately $24,350,221.35 seized from M&I Bank Account #46017675, held in the name of DWB Holding, Co. on August 22, 2008.

    5.    Approximately $100,000 seized from Regions Bank Account #0095243542 held in the name of DWB Holdings, LLC on September 25, 2008;

    6.    Approximately $200,000 seized from Whitney National Bank Account #0730 660 109 held in the name of DWB Holdings LLC[1] on August 26, 2008;

    7.    Approximately $1,006,042.52 seized from SunTrust Bank Account #1000084021137 held in the name of Superior International Timeshares LLC on or about October 29, 2008;

    8.    Approximately $8,383,371.54 seized from SunTrust Bank Account #1000084021285 held in the name of Superior International Investments Corp between October 29 and November 17, 2008;

    9.    Approximately $316,207.00 seized from First National Bank of Central Florida Account #123000153 held in the name of Daniel Rojo Filho on or about November 4, 2008;

    10.    Approximately $10,000.37 seized from First National Bank of

---

[1]The seizure warrant erroneously indicated that DWB Holdings LLC was the account holder.

Central Florida Account #001508156 held in the name of
Daniel Rojo Filho on or about November 4, 2008;

11.     Approximately $46,089.00 seized from First National Bank of
        Central Florida Account #001040804 held in the name of
        Fuad Abuchaibe on or about November 4, 2008;

12.     Approximately $46,499.76 seized from First National Bank of
        Central Florida Account #0001040839 held in the name of
        Enrique Puellos on or about November 4, 2008;

13.     Approximately $71,736.84 seized from Bank First Bank
        Account #100002294 held in the name of Brittany Benevides
        on or about November 4, 2008;

14.     Approximately $200,551.20 seized from Bank First Bank
        Account #200001188 held in the name of Brittany Benevides
        on or about November 17, 2008;

15.     Approximately $251,535.35 seized from Bank First Bank
        Account #200001162 held in the name of Brittany Benevides
        on or about November 4, 2008;

16.     Approximately $200,551.20 seized from Bank First Bank
        Account #200001170 held in the name of Brittany Benevides
        on or about November 17, 2008;

17.     Approximately $303,521.37 seized from RockBridge
        Commercial Bank Account #200002899 held in the name of
        Superior International Investments Corp on or about October
        29, 2008;

18.     Approximately $20,333.41 seized from RockBridge
        Commercial Bank Account #200001507 held in the name of
        Skyview Investments Group LLC on or about October 29,
        2008;

19.     Approximately $39,606.82 seized from RockBridge
        Commercial Bank Account #200001531 held in the name of
        Supreme Car Wash LLC on or about October 29, 2008;

20. Approximately $12,627.65 seized from RockBridge Commercial Bank Account #400002469 held in the name of Superior International Investments Corp on or about October 29, 2008;

21. Approximately $74,978.00 seized from RockBridge Commercial Bank Account #200001353 held in the name of Superior International Investments Corp on or about October 29, 2008;

22. Approximately $14,165.50 seized from RockBridge Commercial Bank Account #200002902 held in the name of Superior International Timeshares LLC on or about October 29, 2008;

23. Approximately $10,250.01 seized from RockBridge Commercial Bank Account #200001523 held in the name of Skyview Trust LLC on or about October 29, 2008;

24. Approximately $9,767.88 seized from RockBridge Commercial Bank Account #200001515 held in the name of Skyview Limo Service of Central Florida LLC's on or about October 29, 2008;

25. Approximately $110,699.89 seized from RockBridge Commercial Bank Account #200000845 held in the name of Sky View Aviation Inc. on or about October 29, 2008;

26. Approximately $15,826.61 seized from RockBridge Commercial Bank Account #200001485 held in the name of Skyview Exotic Car Rental LLC on or about October 29, 2008;

27. Approximately $12,115.57 seized from RockBridge Commercial Bank Account #200001493 held in the name of Skyview International Investments LLC on or about October 29, 2008;

28. Approximately $13,681.94 seized from RockBridge Commercial Bank Account #200001477 held in the name of Skyview Air Inc on or about October 29, 2008;

29. Approximately $11,943.88 seized from RockBridge Commercial Bank Account #200001426 held in the name of Benevides & Associates LLC on or about October 29, 2008;

30.  Approximately $12,581.14 seized from RockBridge
     Commercial Bank Account #200001299 held in the name of
     Infinity Mortgage Group LLC on or about October 29, 2008;

31.  Approximately $11,739.81 seized from RockBridge
     Commercial Bank Account #200001450 held in the name of
     Infinity Properties LLC on or about October 29, 2008;

32.  Approximately $8,271.56 seized from RockBridge
     Commercial Bank Account #200001418 held in the name of
     ABC Auto Wholesalers Inc on or about October 29, 2008;

33.  Approximately $10,685.99 seized from RockBridge
     Commercial Bank Account #200001434 held in the name of
     DiVello Family LLC on or about October 29, 2008;

34.  Approximately $14,354.64 seized from RockBridge
     Commercial Bank Account #200001442 held in the name of
     Fidelity Investment Group LLC on or about October 29,
     2008;

35.  Approximately $11,900.00 seized from RockBridge
     Commercial Bank Account #200001469 held in the name of
     MK & FK Management Inc on or about October 29, 2008;

36.  Approximately $10,191.50 seized from RockBridge
     Commercial Bank Account #200001302 held in the name of
     RGB Outdoor Advertising, LLC on or about October 29,
     2008;

37.  Approximately $363,247.19 seized from SunTrust Account
     #1000075166313 held in the name of DiVello Family LLC
     d/b/a Days Inn Seastone between October 30 and
     November 28, 2008;

38.  Approximately $85,454.78 seized from SunTrust Account
     #1000046692819 held in the name of MK & FK
     Management, Inc d/b/a Knights Inn's between October 29
     and November 17, 2008;

39.  Approximately $18,235.04 seized from Old Southern Bank
     Account #0106000144 held in the name of Superior
     International Investments Corp on or about October 29,
     2008;

40.  Approximately $95,849.71 seized from Center State Bank Account #542007275 held in the name of Leesburg Title & Escrow Services, Inc on or about November 4, 2008;

41.  Approximately $403,619.83 seized from CNL Bank Account #0001044171 held by Brittany Benevides on or about November 4, 2008;

42.  Approximately $484,870.45 seized from CNL Bank Account #0007022585 held by Brittany Benevides on or about November 4, 2008;

43.  Approximately $864,985.00 seized from SunTrust Account #1000077641073 held in the name of Infinity Mortgage LLC on or about October 29, 2008;

44.  Approximately $439,815.22 seized from Community Bank of Florida Account #1308453 held in the name of Superior International Investments Corp. On or about October 29, 2008;

45.  Approximately $1,698.599.09 seized from Old Southern Bank Account #0110001419 held in the name of Superior International Investments Corp on or about October 29, 2008;

46.  Approximately $85,256.43 seized from Old Southern Bank Account #0110001393 held in the name of Sky View Aviation Inc on or about October 29, 2008;

47.  Approximately $200.00 seized from Old Southern Bank Account #0110001641 held in the name of Skyview Air Inc on or about October 29, 2008;

48.  Approximately $19,845.71 seized from Old Southern Bank Account #0110001658 held in the name of Skyview Construction LLC on or about October 29, 2008;

49.  Approximately $100.00 seized from Old Southern Bank Account #0110001724 held in the name of Skyview International Investments LLC on or about October 29, 2008;

50.  Approximately $100.00 seized from Old Southern Bank Account #0110001757 held in the name of Skyview Trust LLC on or about October 29, 2008;

7

51.  Approximately $100.00 seized from Old Southern Bank
     Account #0110001427 held in the name of Superior
     International Timeshares on or about October 29, 2008;

52.  Approximately $5,141.42 seized from Old Southern Bank
     Account #0110001609 held in the name of Fidelity
     Investment Group LLC on or about October 29, 2008;

53.  Approximately $100.00 seized from Old Southern Bank
     Account #0110001625 held in the name of MK & FK
     Management Inc on or about October 29, 2008;

54.  Approximately $100.00 seized from Old Southern Bank
     Account #0110001666 held in the name of Supreme Car
     Wash LLC on or about October 29, 2008;

55.  Approximately $100.00 seized from Old Southern Bank
     Account #0110001690 held in the name of DiVello Family
     Trust LLC on or about October 29, 2008;

56.  Approximately $100.00 seized from Old Southern Bank
     Account #0110001708 held in the name of Benevides &
     Associates LLC on or about October 29, 2008;

57.  Approximately $100.00 seized from Old Southern Bank
     Account #0110001716 held in the name of PBBB
     Investments LLC on or about October 29, 2008;

58.  Approximately $35.00 seized from 1st National Bank of
     Central Florida Account #0002112426 held in the name of
     Superior International Investments Corp on or about October
     29, 2008; and

59.  Approximately $602,398.47 seized from 1st National Bank of
     Central Florida Account #2506963 held in the name of
     Superior International Investments Corp on or about October
     29, 2008.

pursuant to 18 U.S.C. § 981(a)(1)(C), as proceeds traceable to a conspiracy to commit

a "specified unlawful activity," as that term is defined in 18 U.S.C. § 1956(c)(7),

specifically wire fraud offenses. The conspiracy to commit wire fraud offenses that

gives rise to this action is an international Ponzi/Pyramid scheme operated by Evolution

Market Group (EMG) d/b/a Finanzas Forex, DWB Holding Company (DWB), Superior International Investments Corporation (SIIC), German Cardona (Cardona), Daniel Fernandez Rojo Filho (Rojo Filho), Pedro Benevides (Benevides) and others in which investors have been defrauded out of millions of dollars. This action is also brought, pursuant to 18 U.S.C. § 981(a)(1)(A), against SunTrust Bank Account #1000083744432, SunTrust Bank Account #1000083744424, SunTrust Bank Account #1000083744440 (collectively "Trindade SunTrust Accounts"), Regions Bank Account #0095243542 (DWB Developers LLC's Regions Bank Account), Whitney National Bank Account #0730 660 109 (DWB's Whitney Bank Account) and the accounts more particularly described in paragraph 1(C)(9)-(16), (18)-(59) because the monetary transactions conducted to fund theses accounts were made in violation of 18 U.S.C. § 1956(a)(1)(B)(i). Lastly, this action is brought, pursuant to 18 U.S.C. § 981(a)(1)(A), against the Trindade SunTrust, DWB Developers LLC Regions, DWB Whitney Bank Accounts, the accounts more particularly described in paragraph 1(C)(9), (11)-(16), (18)-(46), (48), (58)-(59), as well as the vehicles, because the monetary transactions conducted to purchase the vehicles and fund these bank accounts were made in violation of 18 U.S.C. § 1957(a).

## JURISDICTION AND VENUE

2.   This Court has subject matter jurisdiction over an action commenced by the United States by virtue of 28 U.S.C. § 1345, and over an action for forfeiture by virtue of 28 U.S.C. § 1355.

3.   This Court has *in rem* jurisdiction over the defendant properties pursuant to:

     a.     28 U.S.C. § 1355(b)(1)(A), because pertinent acts or omissions giving rise to the forfeiture occurred in the Middle District of Florida;[2] and

     b.     28 U.S.C. § 1355(b)(1)(B), because venue properly lies in the Middle District of Florida pursuant to 28 U.S.C. § 1395.

4.     Venue is proper in the District Court for the Middle District of Florida, pursuant to 28 U.S.C. § 1355(b)(1), because the acts or omissions giving rise to the forfeiture occurred in this district.

## THE DEFENDANTS *IN REM*

5.     The defendant properties include approximately 294 gold bars (262 gold bars from the Delaware Depository Service Company and 32 gold bars from Inwood Security Vaults). The gold bars were seized pursuant to seizure warrants issued by this Court on February 9 and 11, 2009, respectively, after a probable cause finding that they constituted proceeds traceable to wire fraud offenses, in violation of 18 U.S.C. § 1343. The gold bars are being stored at a depository in Wilmington, DE, under an account controlled by the United States. As explained more fully in the attached affidavit, EMG investor funds were deposited directly into accounts Crowne Gold, Inc. held on behalf of EMG to accept investor deposits. Those funds were subsequently converted into gold bars by Crowne Gold, and therefore, the gold bars represent proceeds of wire fraud violations.

6.     The defendant properties also include the nine vehicles, more particularly

---

[2] While the defendant gold is not within the jurisdiction of this Court, this Court has jurisdiction over the forfeiture of these properties, pursuant to 28 U.S.C. § 1355(b)(1)(A), because the acts giving rise to the forfeiture of the gold, namely the wire fraud schemes described below, occurred there.

described in paragraph 1(B) above. The vehicles were seized pursuant to seizure warrants issued by this Court on February 9, 2009 and January 10, 2009 (Red Escalade), after the Court found probable cause to believe that each vehicle was purchased with proceeds traceable to wire fraud offenses, in violation of 18 U.S.C. § 1343, and were involved in money laundering offenses, in violation of 18 U.S.C. § 1957(a). The vehicles are being maintained at a secured storage facility located in the Middle District of Florida. The vehicles were purchased with funds from accounts that contained EMG and/or DWB investor funds. Accordingly, the vehicles were purchased with proceeds of wire fraud violations. Additionally, the purchase of the vehicles involved monetary transactions conducted with more than $10,000 in wire fraud proceeds. Thus, the vehicles constitute property involved in money laundering violations.

      7.    The defendant properties also include the funds seized from three SunTrust Bank accounts (Trindade SunTrust Funds), more particularly described in paragraph 1(C)(1)-(3) above. The Trindade SunTrust Funds were seized pursuant to seizure warrants issued by this Court on September 16, 2009, after a probable cause finding that they constituted or were derived from proceeds traceable to wire fraud offenses, in violation of 18 U.S.C. § 1343, and were involved in money laundering offenses, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1957(a). The Trindade SunTrust Funds are being held in the United States Customs Suspense Account at the National Finance Center in Indianapolis, IN. Because the Trindade SunTrust Accounts were funded by accounts which directly received EMG and/or DWB investor funds, the seized funds constitute proceeds of wire fraud violations. Additionally, because the

11

funding of the Trindade SunTrust Accounts involved monetary transactions conducted with more than $10,000 in wire fraud proceeds and the transactions conducted to fund these accounts were conducted with wire fraud proceeds that were moved through several bank accounts (held by various corporations and entities) in order to conceal or disguise the illegal source and true ownership of the funds, the Trindade SunTrust Account Funds constitute property involved in money laundering violations.

8.      The defendant properties also include the contents of the DWB M&I, DWB Developers LLC's Regions Bank and DWB Whitney Accounts described more particularly in paragraph 1(C)(4)-(6) above.  The funds seized from these accounts were seized pursuant to seizure warrants issued by United States Magistrate Judges in the District of Arizona, on August 22, 26 and September 25, 2008, respectfully, after a probable cause finding by that Court that the funds constituted proceeds traceable to drug trafficking and were involved in money laundering offenses.  The funds seized from DWB's M&I Bank Account were deposited into the Department of Justice Seized Assets Deposit Fund Account at the Federal Reserve Bank.  The contents of the DWB Developers LLC's Regions Bank Account and DWB Whitney Bank Account were deposited into the Department of Treasury's Asset Forfeiture Fund.

a)      EMG investors deposited their funds directly into DWB's M&I Account.  From there, Rojo Filho transferred $200,000 from DWB's M&I Account into DWB's Whitney Bank Account.  Accordingly, both accounts contain proceeds of wire fraud violations.  Additionally, because the funding of the DWB Whitney Bank Account involved a monetary transaction conducted with more than $10,000 in wire fraud proceeds, the contents of that account constitute property involved in money laundering

12

violations.  Moreover, because the transactions conducted to fund DWB's Whitney Bank

Account were conducted with wire fraud proceeds that were moved into an account not

advertised to investors, the contents of that account constitute property involved in

money laundering violations.

        b)    DWB Developers LLC's Regions Bank Account was funded by

accounts which directly received EMG and/or DWB investor funds; therefore, the funds

seized from it are proceeds of wire fraud violations.  Additionally, because the funding of

DWB Developers LLC's Regions Bank Account involved a monetary transaction

conducted with more than $10,000 in wire fraud proceeds, the contents of DWB

Developers LLC's Regions Bank Account constitute property involved in money

laundering violations.  Lastly, because the transaction conducted to fund DWB

Developers LLC's Regions Bank Account were conducted with wire fraud proceeds that

were moved through several bank accounts (held by various corporations and entities)

in order to conceal or disguise the illegal source and true ownership of the funds, the

contents of DWB Developers LLC's Regions Bank Account constitute property involved

in money laundering violations.

        9.    The defendant properties also include funds seized from the SunTrust,

First National Bank of Central Florida, Bank First, RockBridge Commercial, Community

Bank of Florida, Old Southern, Center State, and CNL Bank Accounts described more

particularly in paragraph 1(C)(7)-(59) above.  The contents of the these accounts were

seized pursuant to seizure warrants issued by United States Magistrate Judges in the

District of Arizona, between October 29 and November 17, 2008, after a probable cause

finding by that Court that the funds constituted proceeds traceable to drug trafficking

and were involved in money laundering offenses.  The contents of these accounts were

deposited into the Department of Justice Seized Assets Deposit Fund Account at the

Federal Reserve Bank.  EMG investor funds were deposited into all of these accounts;

consequently, pursuant to 18 U.S.C. § 984, the funds seized from these accounts

constitute proceeds of wire fraud violations.  Additionally, because the funding of the

accounts more particularly described in paragraph 1(C)(9), (11)-(16), (18)-(46), (48),

(58)-(59) above involved monetary transactions conducted with more than $10,000 in

wire fraud proceeds, the funds seized from those accounts also constitute property

involved in money laundering violations.  Lastly, because the transactions conducted to

fund the accounts more particularly described in paragraph 1(C)(9)-(16), (18)-(59)

above were conducted with wire fraud proceeds that were moved to accounts where the

account holder was unknown to investors, to a bank account not advertised to investors,

or both, in order to conceal or disguise the illegal source and true ownership of the

funds, the funds seized from those accounts constitute property involved in money

laundering violations.

    10.    As set forth in Supplemental Rule G(3)(b)(i), the Clerk must issue a

warrant to arrest the defendant properties if they are in the government's custody.[3]

Accordingly, the Clerk must issue a warrant to arrest the Red Escalade, Vin

_____

    [3]In this regard, however, Supp'l Rule G is inconsistent with the current Local
Admiralty Rule 7.03(b)(1), that requires a judicial officer to first review the verified
complaint, and any other relevant case papers, prior to the Clerk issuing the warrant of
arrest *in rem*.

#1GYFK26289R117904.[4]  However, because the instant action is brought against the

assets more particularly described in paragraph 1(C)(7)-(59) was brought based upon

different forfeiture theories then those which gave rise to the District of Arizona action,

namely that these funds constitute the proceeds of wire fraud and/or money laundering

offenses, the United States requests that this Court, upon a finding or probable cause

that these funds constitute the proceeds of wire fraud offenses and/or were involved in

money laundering offenses, issue warrants to arrest these accounts, pursuant to

Supplemental Rule G(3)(b)(ii).

      11.    All of the Defendant Properties are subject to forfeiture pursuant to 18

U.S.C. § 981(a)(1)(C), because they constitute proceeds traceable to a "specified

unlawful activity," as that term is defined in 18 U.S.C. § 1956(c)(7). A "specified

unlawful activity," as defined in 18 U.S.C. § 1956(c)(7), includes offenses listed in 18

U.S.C. § 1961(1).  Specifically, 18 U.S.C. § 1961(1) includes violations of 18 U.S.C. §

1343 (relating to wire fraud).

      12.    The Trindade SunTrust, DWB Developers LLC Regions, DWB Whitney

Bank Accounts and the accounts more particularly described in paragraph 1(C)(9)-(16),

(18)-(59) are also subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), which

provides for the forfeiture of any property, real or personal, involved in violations of 18

U.S.C. § 1956(a)(1)(B)(i). The funds seized from these accounts are criminally derived

funds that were moved through several bank accounts (held by various corporations

and entities) before being deposited into these accounts.  This was done in order to

---

    [4]The Clerk already issued the warrants of arrest *in rem* for the properties more
particularly described in paragraph 1A(1)-(2), B(1)-(8), and C(1)-(6).

conceal or disguise the illegal source of the funds contained in the Trindade SunTrust,
DWB Developers LLC Regions and DWB Whitney Bank Accounts and to disguise the
true ownership of the funds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  Further, the
funds contained in the accounts more particularly described in paragraph 1(C)(9)-(16),
(18)-(59) are criminally derived funds that were moved to accounts where the account
holder was unknown to investors, to a bank account not advertised to investors, or to
both.  This was done in order to conceal or disguise the illegal source of the funds
contained in the accounts more particularly described in paragraph 1(C)(9)-(16),
(18)-(59) and to disguise the true ownership of the funds, in violation of 18 U.S.C. §
1956(a)(1)(B)(i).

13.     Lastly, the monetary transactions made to fund the Trindade SunTrust,
DWB Developers LLC Regions, DWB Whitney Bank Accounts, the accounts more
particularly described in paragraph 1(C)(9), (11)-(16), (18)-(46), (48), (58)-(59), and the
vehicles were conducted in violation of 18 U.S.C. § 1957(a) because they involved
monetary transactions conducted with more than $10,000 in criminally derived funds
and, as such, are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## FACTS

14.     Specific details of the facts and circumstances supporting the forfeiture
of the defendant properties are contained in the Affidavit of Internal Revenue Service
(IRS) - United States Secret Service (USSS) Financial Crimes Task Force Agent Noel
F. Martinez, Jr., which is attached hereto as Exhibit B and fully incorporated herein by
reference.

15.     As required by Rule G(2)(f), the facts set forth in the attached affidavit

16

support a reasonable belief that the government will be able to meet its burden of proof at trial. Specifically, for the reasons set forth in the attached affidavit, there is probable cause to believe that the defendant properties constitute or are derived from proceeds traceable to a violations of 18 U.S.C. § 1343, and therefore, are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C). Additionally, there is probable cause to believe that the defendant Trindade SunTrust, DWB Developers LLC Regions, DWB Whitney Bank Accounts and the accounts more particularly described in paragraph 1(C)(9)-(16), (18)-(59) were involved in violations of 18 U.S.C. § 1956(a)(1)(B)(i); and the defendant Trindade SunTrust, DWB Developers LLC Regions, DWB Whitney Bank Accounts, the accounts more particularly described in paragraph 1(C)(9), (11)-(16), (18)-(46), (48), (58)-(59), and the vehicles were involved in violations of 18 U.S.C. § 1957(a), and therefore, are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, the United States respectfully requests that the process of forfeiture be issued against the defendant Red Escalade, Vin #1GYFK26289R117904, and the accounts more particularly described in paragraph 1(C)(7)-(59) above; that due notice be given to all interested parties to appear and show cause why the forfeiture should not be decreed, that the court decree the condemnation and forfeiture of the

funds to the United States for disposition according to law, and that the United States be

granted such other relief as the court deems just and proper.

Respectfully submitted,

A. BRIAN ALBRITTON
United States Attorney

By: s/Nicole M. Andrejko
   **Nicole M. Andrejko**
   Assistant United States Attorney
   Florida Bar No. 0820601
   501 West Church St., Suite 300
   Orlando, FL 32805
   Telephone: (407) 648-7500
   Facsimile: (407) 648-7643
   E-mail: Nicole.Andrejko@usdoj.gov

 **Full Name**
Comment goes here.
12 horas atrás · Excluir · Responder · Spam · Block

Compartilhe suas ideias...                                    Publicar

*Seja o primeiro a comentar*

## Transcript

- **1.** DFRF Enterprises LLC A Wealth & Asset Management Company New Solutions for a New Economy A Florida / Massachusetts, USA Company

- **2.** VISÃO GERAL    Quem Somos    A Oferta de Membership Interest    Operações, Minas e Reservas    Parque Comprar Interest da DFRF?    Lastro: Reservas Físicas de Ouro    Conta Global em Banco Suíço

- **3.** QUEM SOMOS A DFRF Enterprises é conduzida por executivos que possuem larga experiência em Finanças, Commodities, Ações e Investimentos. De forma única e exclusiva, a DFRF Enterprises lança o seu Programa de Oferta Pública de Membership Interest (Participação Societária), oferecendo a todos os seus novos Membros um nível excepcional de ganhos que podem chegar a até 15%/mês do valor principal da contribuição inicial feita pelo Membro Participante. 101 Federal Street Suite 1600, Boston, MA – USA Phone: +1(888) 382-6452 Daniel Filho CEO e Presidente A empresa DFRF Enterprises LLC está registrada nos E.U.A., Flórida e Massachusetts - Certificate Number: 14088969120. "Nossa atividade principal na DFRF Enterprises é a produção de ouro e compra de reservas e minas de metais preciosos (Au). Atualmente, nós colocamos no mercado norte-americano, cerca de 10 toneladas de ouro/mês, extraídos das minas de Mali, na África".

- **4.** A OFERTA de MEMBERSHIP INTEREST A empresa DFRF Enterprises LLC oferece, de forma única e exclusiva, uma Oferta Pública de Participação Societária (Membership Interest) a seus novos Membros, a partir de um valor unitário por Participação de USD $1,000 (hum mil dólares americanos). É importante ressaltar que o valor principal inicial pago pelo Membro irá gerar ganhos mensais que podem chegar a até 15%/mês. Estes ganhos ficam depositados, em nome do Membro, em uma conta bancária em Genebra na Suíça, no Banco Platinum Swiss Trust (PST). Para movimentação destes ganhos, o Associado receberá, do Banco PST, um Cartão de Débito (VISA) com capacidade para saques e compras em qualquer parte do mundo. Esta Oferta é documentada em Contrato Operacional entre a DFRF Enterprises e o Membro (pessoa física ou jurídica). O valor principal inicial pago por cada Membro é totalmente assegurado por uma renomada Companhia de Seguros da Inglaterra (Accedium), que emite uma Apólice de Seguro no valor da contribuição inicial feita pelo membro participante.

- **5.** ESTRUTURA OPERACIONAL    DFRF PST BANCO SUÍÇO Platinum Swiss Trust Banco Suíço onde ficam depositados todos os ganhos dos Membros MINERAÇÃO PRÓPRIA Produção de Ouro (10 Ton/mês) – Mali, África Tecnologia própria para extração, refino e venda de Ouro nos EUA RESERVAS METAIS PRECIOSOS Reservas de Metais Preciosos (Au) no Brasil / 75 ton. de ouro Estrategicamente mantidas para novas Fases dos Projetos Da DFRF GEOSOL GEOLOGIA Maior empresa de Estudos Geológicos do mundo Empresa canadense emitiu Certificado de Avaliação das Reservas ACCEDIUM SEGURADORA Seguradora Británica (Barbados e UK.) Garante o Seguro de até USD $3,500,000,000 para esta operação GLOBAL NOTE Carta de Crédito USD $3,5 Bilhões já monetizados em Banco Suíço e segurados pela Accedium, com base nos laudos da GEOSOL.

- **6.** RESERVAS e MINAS de OURO • Localidade: CAMARINHA, Município de Campo Largo / PR / BRASIL • Área: 3.400.000,00 m² • Latitude:25° 26' 6'' S • Longitude: 49° 39' 52'' W • Estudo Geológico: Able Laboratory LAKEFIELD GEOSOL (entre as melhores do mundo em estudos geológicos ) • Potencial: 75 toneladas • Avaliação: USD $4,000,000,000 (quatro bilhões de dólares americanos) • DNPM: 826.029/2004 • CVM: 22.870 • CIM: NI 43.101 Localização da Reserva Camarinha, Campo Largo - PR PROJETO CAMARINHAS

 How Digital & Big Data Revolution '
Transform Primary Care Medicine
PYA
74 views

 La revolution digitale dans le BtoB p
jeremy dumont pour R9
Jérémy DUMONT
7,454 views

 You're Unique, Just Like Everyone E
Shawn Pfunder
89 views

 Scaling Big Data Mining Infrastructu
Twitter Experience
Hadoop_Summit
15.003 views

 10 hypertension
internalmed
15,585 views

 Startup Here, Startup Meow
#StartupAddVenture @ #ICTSummit
(Warsaw, Poland)
Vitaly Golomb
4,291 views

 Keys to a Successful business
Ant Denavi
4,604 views

 5 Lessons For Entrepreneurs
Ian Lurie
82,758 views

 DFRF Enterprises Com Mestre Shao
CEO Daniel Fernandes Rojo Filho
Mestre Shao
183 views

 pim2, pimii
Andre Fernandes
51 views

 Geppetto Comunicação - Romap Seg
Gustavo Pauricio Fonseca
1,905 views

 Apresentacao Fx2010
Flavio Guterres
713 views

 Operações de microsseguros numa
seguradora
Universidade Federal Fluminense
151 views


EXHIBIT
B

- **7.** PROJEÇÃO DE RETORNO MENSAL/ANUAL. Mês Participação Inicial Máx. % Mês Retorno Mensal ($) Saldo Mensal ($) 1 $ 10.000,00* 15% $ 1.500,00 $ 11.500,00 2 $ 11.500,00 15% $ 1.725,00 $ 13.225,00 3 $ 13.225,00 15% $ 1.983,75 $ 15.208,75 4 $ 15.208,75 15% $ 2.281,31 $ 17.490,06 5 $ 17.490,06 15% $ 2.623,51 $ 20.113,57 6 $ 20.113,57 15% $ 3.017,04 $ 23.130,61 7 $ 23.130,61 15% $ 3.469,59 $ 26.600,20 8 $ 26.600,20 15% $ 3.990,03 $ 30.590,23 9 $ 30.590,23 15% $ 4.588,53 $ 35.178,76 10 $ 35.178,76 15% $ 5.276,81 $ 40.455,58 11 $ 40.455,58 15% $ 6.068,34 $ 46.523,91 12 $ 46.523,91 15% $ 6.978,59 $ 53.502,50 *Participação Mínima: A partir de USD $1.000 Taxa de Seguro: 7% sobre o valor principal inicial Um sistema totalmente seguro, onde o seu dinheiro trabalha para você, mesmo enquanto você dorme.

- **8.** $60,000.00 $50,000.00 $40,000.00 $30,000.00 $20,000.00 $10,000.00 $- PROJEÇÃO GRÁFICA DE RETORNO Visão Gráfica do Retorno 1 2 3 4 5 6 7 8 9 10 11 12 Participação Retorno Saldo Cartão de Débito bandeira VISA para movimentação do seu Saldo, emitido pelo Banco PST da Suíça para os Membros ativos da DFRF. Meses

- **9.** COMPRATIVO de RETORNO MENSAL 0.6% 2.3% 2.1% 1.8% 15% Poupança: Commodities: Dólar: Fundos: DFRF:

- **10.** RISCO, GARANTIA & CONTRATO Apólice de Seguro no valor total principal inicial e de todo o valor reintegrado no Programa de Membership da DFRF que o Menbro fizer. Contrato de Participação Societária (Membership Interest) entre a Companhia DFRF e o Membro Participante. Todo segmento de negócio oferece um certo grau de risco. Todavia, uma análise minuciosa do risco deste modelo de operação, aponta para uma margem de risco praticamente zero. 100% SEGURANÇA & CONFORTO para VOCÊ e para o seu CAPITAL.

- **11.** COMO se TORNAR um MEMBRO Membro Potencial ? Possui Referente ? Fim do Processo Obter Referente ? SIM NÃO Solicitar e preencher documentos e formulário de inscrição de Membros e enviar cópia dos documentos e do pagamento para o escritório do Manager. SIM NÃO NÃO SIM Aquisição de Membership Interest DFRF     Apólice de Seguro     Conta Global PST     Contrato Operacional     Certificado de Menbro     Cartão Débito VISA Manager executa o cadastramento e registra o novo Membro no Sistema. MEMBRO ATIVO SISTEMA DFRF/PST

- **12.** RESUMO da OPERAÇÃO DFRF DFRF Oferta de Membership CORPO JURÍDICO REGISTROS & CONTRATOS BANCO PST PLATINUM SWISS TRUST SEGURADORA ACCEDIUM - UK LASTRO RESERVAS FÍSICAS de OURO MEMBROS – MEMBERSHIP INTEREST CERTIFICADO DE MEMBRO CONTA GLOBAL – BANCO SUIÇO PST RETORNO DE ATÉ 15% MÊS CARTÃO DÉBITO VISA Compra Participação Ganhos de 0-15%/mês

- **13.** DFRF Enterprises LLC O Seu Dinheiro Trabalhando Pra Você Produzido por: Romildo Da Cunha (DFRF Manager - SP) romwedge@gmail.com / +55 11 96073-9588


Workshop Public-Private Partnership Alban Drouer
505 views


Contigua - Plano de Compensação PT João Paulo
42 views


CooperativasAutônomas Anexo cartil layout Janine Rodrigues
222 views


Conhecimentos bancarios Felipe Willins
2,584 views


Balanco Completo 2007_port Paraná Banco
314 views


Rrrn Ricardo Taca
252 views


Formulário de referência Paraná Banco
1,266 views


Autobrasil souzabia
1,104 views

- PORTUGUÊS (BRASIL)
    - English
    - Francais
    - Español
    - Português (Brasil)
    - Deutsch

- Inglês
- Espanhol
- Portugues
- Francais
- Deutsche

- Sobre
- Carreiras
- Dev & API
- Imprensa
- Blog
- Termos
- Privacidade
- Direitos Autorais
- Suporte

- 
-



Investor.gov
U.S. Securities and Exchange Commission

## Pyramid Scheme

In the classic "pyramid" scheme, participants attempt to make money solely by recruiting new participants. The hallmark of these schemes is the promise of sky-high returns in a short period of time.

Pyramid scheme promoters may go to great lengths to make the program look like a multi-level marketing program selling legitimate products or services. But these fraudsters use money from new recruits to pay off early stage investors until eventually, the pyramid collapses. At some point, the schemes get too big, the promoter cannot raise enough money from new investors to pay earlier investors, and people lose their money.

Ponzi and pyramid schemes are closely related because they both involve paying longer-standing members with money from new participants, instead of actual profits from investing or selling products to the public. Here is how to tell them apart.

| | Pyramid Scheme | Ponzi Scheme |
|---|---|---|
| Typical "hook" | Earn high profits by making one payment and finding others to become distributors of a product. The scheme typically does not involve a genuine product. The purported product may not exist or it may be "sold" only to other people who also become distributors. | Earn high investment returns with little or no risk by simply handing over your money, often the investment does not exist or only a small percentage of incoming funds are actually invested. |
| Payments | Must pay a one-time or recurring participation fee and recruit new distributors to receive payments. | No recruiting necessary to receive payments. |
| Interaction with original promoter | Sometimes none. New participants may enter the pyramid scheme at different levels. | Promoter generally interacts directly with all participants. |
| How the scheme works | Funds from new participants are used to pay recruiting commissions to earlier participants. | Funds from new investors are used to pay purported returns to earlier investors. |
| Collapse | Fast. An exponential increase in the number of participants is required at each level. | May be relatively slow if existing participants reinvest money. |

**Additional Information**

Investor Alert: Beware of Pyramid Schemes Posing as Multi-Level Marketing Programs (http://investor.gov/news/investor-alerts/investor-alert-beware-pyramid-schemes-posing-multi-level-marketing-programs)


EXHIBIT
C

# Daniel Fernandes Rojo Filho        search

Classic   Flipcard   Magazine   Mosaic   Sidebar   Snapshot   Timeslide

## 12th March 2013    Announcing his mega projects

The Brazilian Billionaire Daniel Fernandes Rojo Filho 45 eradicated in the United States officially launch the membership interest for the goldmine platform as offshore financial company managing and operating the Brazilian public company.

The USD $4.3 Billion certified reserve its now pubic.

All 9 mega projects including energy sector in United States and the car manufactory company in association with celebrities on the car industry will be officially in the market on April 2013.

The businessman Daniel Fernandes Rojo Filho 45 couldn't launch before all projects that will increase the American economy in a substantial level just because of a ongoing investigation broth by a deputy sheriff in Central Florida caused a severe damage for this economy.

*Billionaires Media ©*



[http://4.bp.blogspot.com/-8_5p6KRkOzM/UT9vpivuDLI/AAAAAAAAAXw/TgyyRcCt-
WE/s1600/Daniel+Fernandes+Rojo+Filho+at+his+Mansion.JPG]

Dynamic Views template. Powered by Blogger.



**PRIVATE PLACEMENT MEMORANDUM #** 

## OPERATING AGREEMENT

Membership Interest ("Membership Interest") at U.S.D. $▮▮▮ per Interest

### USD $3,500,000,000.00 Maximum Offering for this PPM

### DFRF ENTERPRISES, LLC
### FLORIDA / MASSACHUSETTS LIMITED LIABILITY COMPANY

DFRF ENTERPRISES, LLC, a Florida / Massachusetts Limited Liability Company (the "Company" or "Party A"), is offering (the "Offering") a Membership Interest, at a price of U.S.D $▮▮▮ per Interest (the "Membership Interest" or the "Interest"), to members ("Party B") who meet the financial suitability standards set forth on Pages 7-8 ("Member Suitability Standards"). There is a minimum subscription requirement of U.S.D. $1,000.00 (the "Minimum Subscription"); provided the Company may accept, in its sole discretion, subscriptions for less than the Minimum Subscription.

The subscription rights and this Offering expire at 6:00 p.m. Eastern Standard Time on December 31st 2015, unless further extended or earlier terminated by the Company, in its sole discretion, without notice (the "Offering Termination Date").

There is no public market for the Interests and none will develop in the future; moreover, any transfer of the Membership Interests is subject to the consent of the Company and the Manager (which consent may be unreasonably withheld) and by applicable State and Federal laws of Massachusetts USA; therefore, members must be prepared to hold the Interest for an indefinite period of time.

**PROSPECTIVE PURCHASERS OF THE INTERESTS OFFERED HEREBY SHOULD CONSIDER ALL OF THE RISK FACTORS ASSOCIATED WITH AN INVESTMENT IN THE MEMBERSHIP INTERESTS PRIOR TO MAKING AN INVESTMENT DECISION.**

---

**THESE MEMBERSHIPS HAVE NOT BEEN APPROVED OR DISAPPROVED BY ANY SECURITIES REGULATORY AGENCIES OR COMMISSIONS OF FLORIDA / MASSACHUSETTS - USA, NOR HAS ANY SUCH REGULATORY AGENCIES OR COMMISSIONS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

---

**THESE MEMBERSHIP HAVE NOT BEEN APPROVED OR DISAPPROVED BY EITHER THE SECURITIES AND EXCHANGE COMMISSION OF USA AND BRAZIL/COMISSAO DE VALORES MOBILIAROS (CVM) OR ANY SECURITIES REGULATORY AGENCIES OR COMMISSIONS OF THE COUNTRY WHERE THE MINING OPERATION IS MADE.**

---

The date of this Memorandum is ▮▮▮
**FOR PRACTICES AND REGULATIONS APPLICABLE FOR CITIZENS OF UNITED STATES OF AMERICA, DFRF ENTERPRISES LLC IS NOT A FINRA REGISTERED SECURITIES DEALER OR REGISTERED INVESTMENT ADVISOR. DFRF ENTERPRISES LLC IS NOT REGISTERED WITH THE COMMODITY TRADE COMMISSION (CTC).**

DFRF ENTERPRISES LLC PRIVATE PLACEMENT MEMORANDUM

EXHIBIT
E

AN PARTICIPATION IN THE MEMBERSHIP INTERESTS OFFERED HEREBY INVOLVES A DEGREE OF RISK AND SHOULD BE CONSIDERED ONLY BY MEMBERS WHO DO NOT REQUIRE LIQUIDITY IN THE PARTICIPATION AND WHO CAN AFFORD TO SUSTAIN A LOSS OF PART OR ALL OF THEIR ENTIRE PARTICIPATION.

THE MEMBERSHIP INTERESTS ARE BEING OFFERED WITHOUT REGISTRATION UNDER ANY SECURITIES ACT OR SIMILAR ACTS OR LAWS OF THE COUNTRY WHERE THE MINING OPERATION IS BEING MADE. THIS MEMORANDUM HAS NOT BEEN FILED WITH OR REVIEWED BY ANY SECURITIES REGULATORY AGENCIES OR COMMISSIONS OF ANY COUNTRY WHERE THE MINING OPERATION IS BEING MADE, AND NO SUCH REGULATORY AGENCIES OR COMMISSIONS OF ANY COUNTRY WHERE THE MINING OPERATION IS BEING MADE HAS DETERMINED WHETHER THIS MEMORANDUM IS ACCURATE OR COMPLETE OR PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

## TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | IMPORTANT NOTICES | 3 |
| II. | JURISDICCIONAL NOTICES | 4 |
| III. | APPLICABLE LAWS AND REGULATIONS | 5 |
| IV. | EXECUTIVE SUMMARY | 6 |
| V. | MARKET OPPORTUNITY | 7 |
| VI. | OBJECTIVES AND STRATEGY | 8 |
| VII. | MEMBER SUITABILITY STANDARDS | 8 |
| VIII. | REPRESENTATIONS OF THE MEMBERS | 9 |
| IX. | CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS | 11 |
| X. | RISK FACTORS | 11 |
| XI. | ADDITIONAL CAPITAL CONTRIBUTIONS | 17 |
| XII. | USE OF PROCEEDS | 20 |
| XIII. | DESCRIPTION OF BUSINESS | 21 |
| XIV. | DISTRIBUTION OF AVAILABLE CASH | 21 |

XV.    THE MANAGING MEMBER ...................................................22

XVI.   MATTERS REGARDING MEMBERS ..................................... 22

XVII.  OPERATING AGREEMENT ................................................. 23

XVIII. NO FINANCIAL STATEMENTS ............................................ 24

XIX.   SUITABILITY STANDARDS ................................................. 24

XX.    LEGAL PROCEEDINGS .................................................... 25

XXI.   PROPERTIES ................................................................. 25

XXII.  AVAILABLE INFORMATION ............................................... 25

XXIII. PLAN OF DISTRIBUTION .................................................. 26

XXIV.  FISCAL MATTERS .......................................................... 27

XXV.   DISSOLUTION ............................................................... 28

XXVI.  MISCELLANEOUS ........................................................... 29

EXHIBIT "I"...................................................................................... 32

## I.    IMPORTANT NOTICES

THIS MEMORANDUM IS SUBMITTED TO PROSPECTIVE MEMBERS ON A
CONFIDENTIAL BASIS FOR USE SOLELY IN CONNECTION WITH A PRIVATE
PLACEMENT OF THE COMPANY'S ASSETS. THE DISCLOSURE OF ANY OF THE
DATA CONTAINED HEREIN OR SUPPLIED IN CONNECTION HEREWITH OR THE
USE THEREOF FOR ANY OTHER PURPOSE, EXCEPT WITH THE WRITTEN
CONSENT OF THE COMPANY, IS PROHIBITED. THIS MEMORANDUM MAY NOT BE
REPRODUCED, IN WHOLE OR IN PART, AND IT IS ACCEPTED WITH THE
UNDERSTANDING THAT IT WILL BE RETURNED ON REQUEST IF THE RECIPIENT
DOES NOT PURCHASE THE INTERESTS OFFERED HEREBY.

THE OFFERING IS SUBJECT TO WITHDRAWAL, CANCELLATION OR
MODIFICATION BY THE COMPANY WITHOUT NOTICE. THE COMPANY RESERVES
THE RIGHT, IN ITS DISCRETION, TO REJECT ANY SUBSCRIPTION, IN WHOLE OR
IN PART, FOR ANY REASON OR TO ALLOW TO ANY MEMBER LESS THAN THE
AMOUNT OF INTERESTS SUBSCRIBED FOR.

THE SALE, TRANSFER OR OTHER DISPOSITION OF ANY MEMBERSHIP INTEREST
PURCHASED PURSUANT HERETO IS SUBSTANTIALLY RESTRICTED BY THE
COMPANY'S OPERATING AGREEMENT, WHICH ALL PURCHASERS WILL BE
PARTIES TO, AND BY APPLICABLE FEDERAL AND STATE LAWS OF FLORIDA /
MASSACHUSETTS, UNITED STATES OF AMERICA.

EACH PROSPECTIVE MEMBER MUST MAKE INQUIRIES OF THE COMPANY, THROUGH Veliton Marcos Pereira                    , ONE OF THE MANAGERS OF THE COMPANY'S MANAGING MEMBER, WITH RESPECT TO THE COMPANY'S PROPOSED BUSINESS OR ANY OTHER MATTERS SET FORTH HEREIN, AND MAY OBTAIN ANY ADDITIONAL INFORMATION (TO THE EXTENT THAT THE COMPANY POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE) WHICH SUCH PROSPECTIVE MEMBER DEEMS TO BE NECESSARY IN ORDER TO VERIFY THE ACCURACY OF THE INFORMATION CONTAINED IN THIS MEMORANDUM (INCLUDING THE EXHIBITS HERETO) AND/OR TO MAKE AN INFORMED PARTICIPATION DECISION. IN CONNECTION WITH SUCH INQUIRY, ANY DOCUMENTS WHICH ANY PROSPECTIVE MEMBER WISHES TO REVIEW WILL BE MADE AVAILABLE FOR INSPECTION AND COPYING OR PROVIDED, UPON REQUEST, SUBJECT TO THE PROSPECTIVE MEMBER'S AGREEMENT TO MAINTAIN SUCH INFORMATION IN CONFIDENCE AND TO RETURN THE SAME TO THE COMPANY IF THE RECIPIENT DOES NOT PURCHASE THE MEMBERSHIP OFFERED HEREUNDER. ANY SUCH INQUIRIES OR REQUESTS FOR ADDITIONAL INFORMATION OR DOCUMENTS SHOULD BE MADE IN WRITING TO THE COMPANY, 246 Winthrop St.                    Framingham     MA 01702        US , TELEPHONE: +1 (888) 382-6452, E-MAIL: INFO@DFRFENTERPRISES.COM.

NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION IN CONNECTION WITH THE OFFER BEING MADE HEREBY OTHER THAN THE INFORMATION CONTAINED IN THIS MEMORANDUM OR PROVIDED PURSUANT TO THE PROSPECTIVE MEMBER'S WRITTEN REQUEST TO THE COMPANY OR TO THE MANAGER, AND, IF GIVEN, SUCH INFORMATION MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE COMPANY.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY ANY SECURITY OTHER THAN THE MEMBERSHIP INTERESTS OFFERED HEREBY, NOR DOES IT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY SECURITIES BY ANYONE IN ANY JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED, OR IN WHICH THE PERSON MAKING SUCH OFFER OR SOLICITATION IS NOT QUALIFIED TO DO SO.

THIS OFFER AND SALE OF MEMBERSHIP INTERESTS WILL BE MADE ONLY TO PURCHASERS WHO ARE RESIDENTS OF STATES WHERE THIS OFERING IS PERMITTED (WITHOUT REGISTRATION OR QUALIFICATION) AND WHOM MEET THE SUITABILITY STANDARDS DESCRIBED UNDER MEMBER SUITABLITY STANDARDS BELOW.
PROSPECTIVE MEMBERS ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL, PARTICIPATION OR TAX ADVICE. <u>PROSPECTIVE MEMBERS SHOULD CONSULT THEIR OWN ADVISORS AS TO LEGAL, PARTICIPATION, TAX AND RELATED MATTERS CONCERNING A PARTICIPATION IN THE COMPANY.</u>

## II.    JURISDICTIONAL NOTICES

IN MAKING A PARTICIPATION DECISION, MEMBERS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE STRUCTURE AND THE TERMS OF THIS OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE MEMBERSHIPS HAVE NOT BEEN RECOMMENDED BY ANY SECURITIES REGULATORY AGENCIES OR COMMISSIONS IN FLORIDA / MASSACHUSETTS, USA. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE MEMBERSHIPS ARE SUBJECT TO RESTRICTIONS ON THEIR TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE LAWS OR REGULATIONS IN FLORIDA / MASSACHUSETTS, USA.   MEMBERS SHOULD BE AWARE THAT THEY WOULD BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS PARTICIPATION FOR AN INDEFINITE PERIOD OF TIME.

## III.   APPLICABLE LAWS AND REGULATIONS

DFRF ENTERPRISES LLC although the US laws is not subject to Central Bank supervision and regulation in the financial sector.

DFRF ENTERPRISES LLC, Address: 129 Concord St. Suite 25
Framingha M 01702   US, Telephone: +1 (888) 382-6452, E-mail: info@dfrfenterprises.com,
Fax: +1 (202) 644-5184, represented by its MGR, Veliton Marcos Pereira
Passport #    YA713479    . Court of Massachusetts, USA.

## IV.   EXECUTIVE SUMMARY

| | |
|---|---|
| **Company** | DFRF ENTERPRISES LLC (the "Company"), a Florida / Massachusetts Limited Liability Company. The Company is located at 129 Concord St. Suite 25 Framingham    MA 01702    US, Telephone: +1 (888) 382-6452, E-mail: info@dfrfenterprises.com |
| **Business** | The Company's primary business will be to buy and operate Gold claims and mines. The Company will make independent determinations with respect to each mine it purchases; and all mines will be operated by qualified and experienced mine operators. The business of the Company may change over time based on the economy and other factors. |
| **Membership Offered** | An offering of a Membership Interest is being offered hereby, at a price of U.S.D. $1,000.00 per Interest. The Minimum Subscription generally will be one (1) Interest or U.S.D. $1,000.00; however, subscriptions for less than the Minimum Subscription may be accepted at the Company's sole discretion. (See "Terms of the Offering") |

| | |
|---|---|
| **Use of Proceeds** | The Company will use the net proceeds from the Offering to operate the business as outlined above. Net proceeds will be held by the Company in accounts with one or more financial institutions, pending utilization of such proceeds. |
| **Terms of the Offering** | The Offering Termination Date is December 31st 2015, unless further extended or earlier terminated by the Company, in its sole discretion, without notice. |
| **No Minimum Offering/Release of Funds** | All funds received and accepted by the Company in connection with subscriptions will be deposited in the Company's operating account(s) as and when such subscriptions are accepted. Upon the rejection by the Company of a subscription (or a portion thereof), the funds accompanying the rejected subscription will be returned to the subscriber (without deduction or interest). |
| **Member Suitability** | None of the Interests will be sold to a prospective member unless such member satisfies the financial and other suitability criteria described under Member Suitability Standards at Pages 7-8. Each Prospective Member will be required to execute a subscription agreement and a purchaser's questionnaire in the forms of Exhibit "B" attached hereto (the "Subscription Agreement"). In the Subscription Agreement, a prospective member will be required to represent that, in connection with evaluating the merits and risks of an participation in the Company, the member has such knowledge and experience in financial and business matters that the member is capable of making such an evaluation and making an informed participation decision. The Company reserves the right, in its sole discretion, to reject any potential member and to limit the amount of the participation by any prospective member. |
| **Payments to the Manager** | The Managing Member shall receive an annual fee of two percent (2.0%) of the total principal managed in Mortgage Loans by the Company (the "Manager's Minimum Annual Compensation"). Additionally, the Managing Member shall receive, as additional compensation, twenty percent (20%) of all of the Company's Available Net Cash Flow. |
| **Membership Interests** | Certificates of Membership Interests will be delivered within approximately four (4) weeks after acceptance by the Company of a Prospective Member's subscription agreement. |

**Risk Factors**

Participation in the Interests involves a degree of risk. Members are advised to consider all of the risk factors of a participation in the Membership Interests offered hereby. Prospective members are encouraged to ask questions of and receive answers from the Company's Managing Member and, by virtue of the rights and responsibilities afforded in the Company's Operating Agreement that all holders of the Membership Interests will be parties to, control person, Veliton Marcos Pereira                       , prior to making any participation in the Membership Interests.

**Settling Disputes**

All Controversies that may arise between the Members and the Managing Members/Manager(s) will be subjected to binding arbitration to resolve. Each Member will sign an Arbitration Agreement.

## V.   MARKET OPPORTUNITY

The Company believes that there is significant market opportunity to purchase Gold mines and operate Gold mines. These mines may be viewed as risky enterprises. However, the Company intends to offset this increased risk by performing a thorough due diligence review in order to understand and reduce risk, ensure the financial viability of the mines. This due diligence will consist of:

1) Reviews of the companies that are selling mines to the Company.
2) The due diligence will include:
    a) A comprehensive review of the mine; and,
    b) Confirming that the company selling the mines is complying with our written guidelines and that applicable state and federal laws are followed.

## VI.   OBJECTIVES AND STRATEGY

The Company's objective is to provide Members with the opportunity to participate in Gold mines and achieve a superior rate of return from the operations and/or the eventual monetization or sale of the gold mines. The Company will target mines that are extremely desirable. The Managing Members' experience in this environment will provide a critical advantage to the Company to recognize, evaluate, contract and operate these mines.

The Company's strategy in developing and managing the participation portfolio will consist of several aspects. First, the Company will purchase mines that we have already contracted. Second, the company will identify additional unique mining opportunities. Third, the Company will properly analyze and structure the particular mining opportunities. Fourth, the Company will strive to maintain a focused portfolio, both in types of mines and geographic region. Fifth, the Company will diligently manage the portfolio to minimize losses. Lastly, the Company will devise and, when necessary, implement appropriate exit strategies.

The Company intends to monetize the mines and/or obtain credit facilities from financial institutions. The credit facilities will allow the Company to leverage its assets and thus, increase the rate of return on its participation. Any financial institution that provides a credit facility will require the Company to give a first lien on the Company's assets. The financial institution's lien will take priority over the Membership Interests. The Managing Member believes that the risk is worth the increased rate of return that will result from the ability to leverage.

## VII.   MEMBER SUITABILITY STANDARDS

**THESE MEMBERSHIP INTERESTS INVOLVE A DEGREE OF RISK AND SHOULD NOT BE PURCHASED BY A PROSPECTIVE MEMBER WHO CANNOT AFFORD A LOSS OF A PART, OR ALL, OF SUCH PROSPECTIVE MEMBER'S PARTICIPATION OR BY A PROSPECTIVE MEMBER WHO CANNOT HOLD THE PARTICIPATION FOR AN INDEFINITE PERIOD OF TIME.**

### Substantial Means and Net Worth

Purchase of Membership Interests is suitable only for member who have no need for liquidity in this participation and who have adequate means of providing for their annual needs and contingencies. Accordingly, no membership will be sold to any prospective member unless such member is an member who: (i) has a net worth (inclusive of homes, personal property and automobiles) of at least $1,000,000, or (ii) has during the last two years, and expects to have during the current year, gross income from any source of at least $200,000. A prospective member will be required to represent in writing in the Subscription Agreement that such prospective member meets the aforementioned requirements.

### Relationship to Company and Access to Material Information

All members, by reason of their business or financial experience, or that of their purchaser representatives who are unaffiliated with and who are not compensated by the Company or any affiliate or selling agent of the Company, directly or indirectly, may be reasonably assumed to have the capacity to protect their own financial interests in connection with this transaction. (See "Purchase Representative Questionnaire" attached hereto). Prior to the sale of the Interests, each member will be given reasonable access to the books and records of the Company, any material agreements and documents relating to the proposed transaction and an opportunity to question the Company's Managing Member.

### Ability to Comply with Subscription Requirements and Procedures

Members are required to purchase the Membership Interests under the terms and conditions set forth in the Subscription Agreement. Subscribers for the Membership Interests must tender to the Company, pursuant to the Subscription: (i) a check drawn to the order of the Company for the full amount of the Membership Interests subscribed; (ii) an executed copy of the Subscription Agreement; (iii) an executed copy of the Purchaser Questionnaire; and (iv) an executed copy of the Operating Agreement (the "Operating Agreement") by and between the Company and all subscribers who are accepted as members (the "Members") and who are permitted to purchase Membership Interests.

### Ability and Willingness to Accept Risks

A capital participation in the Company involves business and financial risks that may result in a loss of part or all of a member's entire participation. Accordingly, the suitability of any particular member will depend upon, among other things, such member's participation objectives and such member's ability to accept risks, such as an participation in the Membership Interests.

DFRF ENTERPRISES LLC PRIVATE PLACEMENT MEMORANDUM

**Ability to Accept Limitations on Transferability**

Members may not be able to liquidate their participation in the event of a financial emergency or for any other reason because there is not now any market for the Interests and no such market will develop in the future. In addition, transfer of the Membership Interests is subject to substantial restrictions under the Operating Agreement and any applicable laws, or regulations of Massachusetts, USA.

## VIII. REPRESENTATIONS OF THE MEMBERS

By their execution below, each Member represents and warrants to the Company as follows:

The Member has been furnished or otherwise obtained all information necessary to enable him to evaluate the merits and risks of his prospective participation in the Company. The Member recognizes that the Company has no prior operating history, may be highly leveraged and involves substantial risks. A participation in the Company is highly speculative and the Member may suffer a complete loss of his participation.

The Member has been furnished or has had access to any and all material documents and information regarding the Company, and the Members. The Member has had an opportunity to question the other Members and receive adequate answers to such questions. The Member hereby acknowledges that the Company has made available to the Member prior to any participation in the Company all information requested by the Member and reasonably necessary to enable the Member to evaluate the risks and merits of a participation in the Company. The Member, after a review of this information and other information he has obtained, is aware of the speculative nature of any participation in the Company.

The Member is aware that the Member will have to make the Capital Contributions required hereunder. The Member can bear the economic risk of the participation in the Company (including the possible loss of his entire cash payment and any amount guaranteed) without impairing the Member's ability to provide for himself and/or his family in the same manner that the Member would have been able to provide prior to making a participation in the Company. The Member understands that he must continue to bear the economic risk of the participation in the Company for an indefinite period of time.

The Member understands that the Member Interests have not been registered under the laws, or regulations of Massachusetts, USA. The Member understands that he has no rights whatsoever to request, and that the Company is under no obligation whatsoever to furnish, a registration of the Member Interests under the Laws of Massachusetts, USA.

The Member Interests that the Member is acquiring are being acquired solely for his account and are not being purchased with a view to, or for resale in connection with, any distribution within the meaning of the Laws. The Member will not resell or offer to resell any Member Interests except in accordance with the terms of this Agreement and in compliance with all applicable Laws.

The Member acknowledges that there is no current market for the Member Interests and none is anticipated to develop. Moreover, there are substantial restrictions on the Transfer of

the Member Interests. Therefore, the Member has considered its prospective participation in the Company to be a long-term illiquid participation acceptable because the Member is willing and can afford to accept and bear the substantial risks of the participation for an indefinite period of time.



The Member is aware that there is no assurance, representation or warranty, by any Person, that the Company's Business and the other assets anticipated to be acquired by the Company will operate at a return, will generate sufficient cash flow for distribution to the Members, or will appreciate in value or be sold at a return. The Members, by Required Vote, are authorized to incur indebtedness on behalf of the Company to pay costs incurred in conducting and completing the Company's Business, to establish and maintain reserves for working capital, taxes, insurance and other costs and expenses, to raise substantial debt financings, and to use Company revenues to pay the organization costs and debt costs of the Company. The use of Company revenues for such purposes will delay the Member's receipt of available cash distributions from the Company, and may require the Member to report and pay tax on Company income without having received contemporaneous cash distributions, even if the Company is lucrative.

The Member understands that if he receives a distribution from the Company at a time when the liabilities of the Company exceed the fair market value of the Company's assets, the Member will be liable to the Company for the amount of such distribution, and such liability shall continue for three (3) years from the date of the distribution. In addition, the Member will be liable to the Company and/or its creditors as provided by the Law.

The Member is aware that the governmental taxing authority may audit the income tax returns of the Company and may audit the Member's income tax return as the result of the Member's participation in or claimed deductions or losses from its participation in the Company. Such deductions and losses, when taken together with other items reported on the Member's tax return, may prompt the governmental taxing authority to examine the Member's return, both as to income and deductions relating to the Company and as to other matters. The Company and the Managers cannot assure the Member that such an audit or examination will not occur or that the Member will not incur additional liability and costs as a result of any such audit or examination.

## IX. CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS

From time to time, including herein, in any Company documents, or in response to inquiries from prospective or accepted Members, the Company may publish "forward-looking" statements. Words such as "expects," "anticipates," "intends," "plans," "believes," "seeks," "estimates," or variations of such words and similar expressions are intended to identify such forward-looking statements. These statements are not guarantees of future performance and involve certain risks, uncertainties and assumptions. Therefore, actual outcomes and results may differ materially from what is expressed or forecasted in such forward-looking statements.

The Company undertakes no obligation to update publicly any written or verbal forward-looking statements, whether as a result of new information, future events or otherwise.

## X.    RISK FACTORS

A participation in the membership offered hereby involves a degree of risk and is speculative in nature. Prospective members should carefully consider the following risk factors, as well as others described elsewhere in this Memorandum relating to the business of the Company

and this Offering. The discussion below highlights some of the more important risks regarding the Company. The risks highlighted below should not be assumed to be the only factors that could affect future performance.



## Forward-Looking Statements and Associated Risks

This Memorandum and any Company documents may contain certain forward-looking statements, including anticipated accomplishments and events in the Company's financial condition and results of operations. When used in this Memorandum, in other Documents or oral advice given by the Managers to prospective subscribers, the words "believes", "intends", "anticipates" "expects" and similar expressions are intended to identify forward-looking statements. These forward-looking statements are based largely on the Company's current expectations and are subject to a number of risks and uncertainties. In addition to the other risks described elsewhere in this "Risk Factors" section, important factors to consider in evaluating such forward-looking statements include:

(i)     Changes in external market factors which might impact trends, growth strategies and events in the Company's results of operations;

(ii)    Unanticipated working capital and other cash requirements; and,

(iii)   General changes in the industry and regulations related thereto in which the Company operates. In light of these risks and uncertainties, some of which may be described in greater detail elsewhere in this Memorandum, actual results could differ materially from such forward-looking statements.

## No Assurance of Liquidity

The Company it has not undertaken any operations. There can be no assurance that the Company will be able to be lucrative in the future or that its liquidity, if any, will meet or approach the Company's anticipated liquidity.

## Phantom Income

Some members may choose to reenter with their return. Participating with the return will be automatically converted to Membership Interests based on the share price as of the date of renew the participation. After year-end, the member will receive a tax report or other form, if appropriate, representing their respective income from their participation. The member that renews their return will incur a tax liability on income that the member did not actually receive.

## Control by Managers.

As a result of the authority and responsibility provided to the managers in the Operating Agreement, the Company's Managing Member will control virtually all matters relating to the Company's business.

## Dependence on the Managers

By virtue of the duties and responsibilities provided for in the Operating Agreement, the success of the Company will be wholly dependent upon the efforts of the Managing Member's Managers. The loss of services of one or more of the managers would have a substantial adverse effect upon the business affairs and finances of the Company and could, pursuant to the Operating Agreement, result in the liquidation of the Company.

DFRF ENTERPRISES LLC PRIVATE PLACEMENT MEMORANDUM

The Company's ability to carry out its business plans depends upon its and the Managing Member's ability to: (1) institutionalize the Company's mining operations and decision-making functions.

### Company's Expansion Plan

Although the Company does not presently anticipate increasing funds available to finance new mines beyond the net proceeds that may be realized from this Offering and any credit facility, the Company's Operating Agreement does permit the Managing Member to authorize the sale of additional Interests, in the Managing Member's sole discretion.

### No Public Market for the Interests; Lack of Active Public Market for the Membership Interests

There is no public market for the Interests offered hereby and none will develop. The membership interests have not been registered under the laws, or regulations in Massachusetts, USA, and accordingly will be deemed "restricted" and as such, cannot be sold, transferred, hypothecated, pledged, assigned or otherwise disposed, unless they are registered under the appropriate Laws or, if in the opinion of counsel satisfactory to us, such sale, transfer, hypothecation, assignment, pledge or disposition is exempt from such registration requirements. There is currently no public trading market for the membership interests and no assurance can be given that a public market for the membership interests will ever develop, or if developed would be sustained in the future or as to what exchange or inter-dealer quotation system that the membership interests would be traded on, if at all. Furthermore, the Company does not have the obligation to repurchase your participation. Accordingly, your participation in the membership interests is an illiquid participation and no assurance can be given as to your ability to dispose or otherwise liquidate your position in the Company.

### You Have a Limited Ability to Have Your Interests Redeemed

A Member has the right to sell back their Membership Interests pursuant to certain limitations. No Member shall have the right to withdraw, in whole or in part, such Member's Capital Account Balance prior to the first day of the month immediately following the first anniversary of the acquisition date of such Member's Membership Interest (the "Lock-Up Period"). After the Lock-Up Period with respect to a Membership Interest held by a Member, subject to the terms and conditions hereof, such Member shall have the right to withdraw all (but not less than all) of such Member's Capital Account Balance with respect to such Membership Interest from the Company effective as of December 31 of any calendar year, by delivering to the Managing Member not later than October 31 of such calendar year a notice in writing requesting such withdrawal. The Company shall distribute to such Member by April 1 of the following year (or sooner in the Managing Member's sole discretion), an amount equal to 100% of such Member's Withdrawn Capital Account Balance in each case in cash, or in-kind, or a combination thereof, without interest.

If withdrawal requests are received with respect to any calendar year for 20% or more of the Net Asset Value of the Company, the Managing Member may, in its sole discretion, (i) satisfy all such withdrawal requests, (ii) satisfy such withdrawal requests on a "first come, first served" basis in the order that such written requests were received by the Managing Member

or (iii) reduce all withdrawal requests *pro rata* so that only 20% (or more, at the sole discretion of the Managing Member) of the Net Asset Value of the Company is withdrawn.

The amount of a member's distribution depends solely on the Member's Capital Account on the date of the distribution, even if this is not the same as the Member's proportionate share of the then fair market value of the Company's assets. The selling Member shall not be paid based on the Book Value or Fair Market Value of the Company's assets. There is no reserve fund for repurchases. The Company is not required to sell assets in order to redeem Membership Interests. Repurchases are made on a first come first served basis and payments are made only to the extent the Company has available cash and the redemption would not adversely affect the Company's capital or operations, in the Company's sole discretion.

## Distribution of Available Net Cash Flow

The Company intends to distribute, on an annual basis, net cash flow available for distribution after the mines' infrastructure have been completely developed.

Any earnings received by the Company shall be deposited in the Company's bank account(s) and shall be available to participate in the current or additional mines or pay down any outstanding lines of credit or other Company indebtedness to unaffiliated third-party lenders or creditors. Our ability to pay any return on the participation and to meet our other financial obligations depends on our operating performance, the state of the financial markets and other factors. Accordingly, we cannot assure you that we will be able to meet our obligations to pay the returns referenced herein.

## Sell/Securitize the Portfolio

The Company has the right to sell or securitize the entire portfolio. In the event this is done, the member will receive a payout, after the payment of all fees and costs associated with the sale or securitization and other general obligations, as follows:

1. Return of participation to the Member, to the extent not already received;
2. Management fee to the Managing Member, to the extent not already paid;
3. 80% of remaining proceeds to the Members in their proportionate interest; and
4. 20% of the remaining proceeds to the Managing Member.

## Lack of Performance Data

We do not have representative historical earnings, reserves experience that may be referred to for purposes of estimating the future earnings of our purchased mines. In view of our lack of loan performance data, it is extremely difficult to validate our loss or prepayment assumptions. Any material difference between these assumptions and actual performance could have a material adverse impact on the timing and/or receipt of our future revenues and our cash flow.

## Ability to Sustain Growth

There are no assurances that we can grow, successfully manage our infrastructure or recruit and retain sufficient personnel. We intend to continue to pursue a growth strategy for the foreseeable future. These plans requires additional capital and human resources and there can be no assurance that we will continue to effectively manage information and operating systems, that we will be able to identify and hire adequate numbers of qualified employees to support our growth or that management will be able to manage the planned growth effectively. In addition, there can be no assurance that we will achieve our planned growth in a timely and cost-effective manner or, if achieved, that the expansion will result in positive operations. Our failure to implement our planned growth would have a material adverse effect on our results of operations, financial condition and business prospects.

## Mining Industry

The Company intends to purchase mines from companies and/or individuals in the mining industry. Mining is subject to certain risks, including, but not limited to, risks related to (i) the ability to extract the minerals in a lucrative manner (ii) the fluctuations in the commodity markets and (iii) the negative impact of economic slowdowns or recessions. Our failure to adequately address the risks of mining and commodity prices would have a material adverse impact on our results of operations, financial condition and business prospects.

## Liquidity, Negative Cash Flow

Our business requires substantial cash to support our operating activities and growth plans. There can be no assurance that we will be able to generate, renew, replace or add to capital and/or credit facilities, or that we will be able to undertake capital markets financings on favorable terms, if at all, If we are unable to generate adequate income or obtain adequate financing, we may have to curtail our growth plans. This may have a significant adverse impact on results of our operations, financial condition and business prospects. In addition, to the extent that we are unable to generate income or expand our access to credit facilities, we may have to undertake capital markets financings or additional capital raised. Capital markets financings/Capital raises may result in greater than anticipated interest expense and shares outstanding, which may have a dilutive impact on operating earnings or have a negative effect on our financial condition.

## Dependence on Other Mineral Sales for Future Earnings

The gain generated by other mineral sales may also represent a source of our future earnings. There can be no assurance that market prices for these minerals will make be rentable and Further, adverse conditions in the world economy could negatively impact our ability to liquidity extract and deliver these minerals to prospective buyers.

## Economic Slowdown or Recession

The risks associated with our business are more acute during periods of economic slowdown or recession because these periods may be accompanied by decreased demand for Gold and minerals. Declining Gold and Commodity prices reduce the ability to use our properties' equity to support borrowings. In addition, the actual Commodity prices could adversely affect our liquidity.

## Changes in Interest Rates

Our liquidity may be directly affected by changes in interest rates. Adjustable-rate mortgage loans may, in the future, have a life rate cap above, which the interest rate on the loan may not raise. In the event of general interest rate increases, the rate of interest on these mortgage loans could be limited, while the rate payable on the warehouse facilities may be uncapped, which would reduce the amount of cash we receive. This could have a material adverse effect on our results of operations, financial condition and business prospects.

During periods of decreasing commodity prices, the value and liquidity of our mines may be negatively impacted. The market values of gold and other mineral commodities are more sensitive to changes in market interest rates and the value of the US Dollar. We may, from time to time use various hedging strategies to provide a level of protection against such commodity/USD rate risks. While we believe any hedging strategies are cost-effective and provide some protection against interest rate risks, no hedging strategy can completely protect us from such risks. No assurance can be given that such hedging transactions will offset the risks of changes in commodity prices, and it is possible that there will be periods

Page 14 of 33

during which we could incur losses after accounting from our hedging activities. Further, we do not believe that hedging against commodity price declines is cost effective and we do not utilize the hedging strategies described above with respect to these mines, which constitute the majority of our intended portfolio.

## Competition

We face intense competition in the business of purchasing and operating gold mines.

Many of our competitors are substantially larger and have considerably greater financial, technical and marketing resources than us. Our competitors in the industry include other mining companies, commodity trading companies and commercial banks.

Fluctuations in commodity prices and general and localized economic conditions may also affect the competition we face. During periods of declining prices, competitors may lower prices below market prices. Any inability to sell our Gold or minerals at market prices could cause a substantial decrease in our returns, which could have a material adverse effect on our results of operations, financial condition and business prospects.

## Risks Associated with Mining Operations

We may hire a third party or parties to operate our mines. We are subject to risks associated with insufficient servicing or fraud. Any failure of the mine operator to service our mines could cause a substantial decrease in our returns, which could have a material adverse effect on our results of operations, financial condition and business prospects.

## Dependence on a Limited Number of Key Personnel

We are dependent upon the continued services of Veliton Marcos Pereira
, the manager of our Managing Member. The loss of their services could have a material adverse effect on our results of operations, financial condition and business prospects.

## Concentration of Operations in Brazil

Our mine purchases and operations may be concentrated in Brazil for the foreseeable future. Consequently, our results of operations, financial condition and business prospects are dependent on the Brazilian economy and commodity market. Over the last several years, world economy experienced an economic slowdown or recession and a sustained decline in many markets, which have helped to buoy Gold prices.

Gold and commodity price declines may adversely affect the revenues of the mines. In addition, Brazil is vulnerable to certain natural disaster risks, such as floods. These disasters are not typically covered by the standard hazard insurance policies and may adversely impact our ability to operate. The existence of adverse economic conditions or the occurrence of such natural disasters in Brazil could have a material adverse effect on our results of operations, financial condition and business prospects.

## Environmental Liabilities

We will acquire real property and there is a risk that hazardous substance or waste, contaminants or pollutants could be discovered on such properties after we acquire them. We might be required to remove such substances from the affected properties at our sole cost and expense, and the cost of such removal may substantially exceed the value of the affected properties or the loans secured by such properties. Furthermore, we may not have adequate remedies against the prior owners or other responsible parties to recover our costs. Finally, we may find it difficult or impossible to sell the affected real properties either before or after any such removal.

Governments may change environmental rules and regulations. Laws applicable to mining activity are subject to modification and change. There can be no assurance that future proposed laws, rules and regulations, or other such laws, rules or regulations, will not be adopted in the future. Such adoption could make compliance much more difficult or expensive, restrict our ability to operate liquidity, further limit or restrict the volume of the operations and may adversely affect our results of operations, financial condition and business prospects. Such altered regulations could cause a substantial decrease in our returns, which could have a material adverse effect on our results of operations, financial condition and business prospects.

## Legislative or Regulatory Risks

The mining industry is a highly regulated industry. The mines operated by the Company are subject to extensive laws and regulations. These laws limit the operations and the techniques that may be utilized.

Laws applicable to mining activity are subject to modification and change. In addition, various laws have been proposed, which, if adopted, could materially, adversely impact our business. There can be no assurance that future proposed laws, rules and regulations, or other such laws, rules or regulations, will not be adopted in the future. Such adoption could make compliance much more difficult or expensive, restrict our ability to operate liquidly, further limit or restrict the volume of the operations and may adversely affect our results of operations, financial condition and business prospects.

Government officials have from time to time suggested increasing the mining taxes for federal income tax purposes. Because many of our future projections are based on current tax rates the competitive advantages of the current tax rate, when compared with alternative sources of minerals, could be eliminated or seriously impaired by such governmental action. Accordingly, the reduction or elimination of these tax benefits could have a material adverse effect on our ability to sell our Gold and minerals at a return.

In addition to factors discussed in this Memorandum, other factors that could cause the Company's results to differ materially are general economic and business conditions, and the impact of competitive services and pricing.

## Uninsured Risk

The Company carries insurance on the infrastructure and the equipment used in our operations but certain types of losses may not be covered by insurance, such as losses due to terrorism or acts of war. Consequently, the Company could significantly impact the value of the assets that could result in the loss of all or part of the participation.

## Unknown Risks

The Company has tried to itemize all the known risks but unknown risks may be presented in the future. Such risks could cause a substantial increase in operating expenses or a decrease in our returns, which could have a material adverse effect on our results of operations, financial condition and business prospects.

**Your right to receive payments on the Membership Interests may be subordinate to Senior Debt.**

The Company may obtain credit facilities from banks or other financial institutions in order to leverage the Company's assets and finance operations. Any financial institution that provides a credit facility will require the Company to give a first lien on the Company's assets. The financial institution's lien will take priority over the Membership Interests. The Membership Interests rank junior in right of payment to such credit facilities. As a result, upon any distribution to creditors in a bankruptcy, liquidation or reorganization or similar proceeding relating to the Company, the holders of our senior debt will be entitled to be paid in full before any payment may be made with respect to the Membership Interests. Furthermore, the Company may increase and/or obtain additional credit facilities. Accordingly, you may not receive any payment in a bankruptcy, liquidation, reorganization or similar proceeding.

**There is no market for the Membership Interests and your participation is illiquid.**

The Membership Interests have not been registered under the Securities Act, and accordingly will be deemed "restricted" and as such, cannot be sold, transferred, hypothecated, pledged, assigned or otherwise disposed, unless they are registered under the appropriate laws, or regulations of the country where the participation is being made, or, if in the opinion of counsel satisfactory to us, such sale, transfer, hypothecation, assignment, pledge or disposition is exempt from such registration requirements. There is currently no public trading market for the Membership Interests and no assurance can be given that a public market for the Membership Interests will ever develop, or if developed would be sustained in the future or as to what exchange or inter-dealer quotation system that the Membership Interests would be traded on, if at all, Accordingly, your participation in the Membership Interests is an illiquid participation and no assurance can be given as to your ability to dispose or otherwise liquidate your position in the Company.

**Conflicts of Interest**

The Company will face conflicts of interest regarding the allocation of time spent by persons operating the Company. The managers of the Company's Managing Member are full time employees of DFRF Enterprises LLC. The managers of the Managing Member are not required to expend any minimum amount of time managing the Company. Furthermore, the managers of the Managing Member intend to operate other funds with similar objectives. Additionally some or all of the Managers of the Fund may be shareholders in the Brazilian mining company. This may result in a conflict of interest in the allocation of the managers' time between the Company and these other activities.

The preceding list reflects the Company's current knowledge of existing or potential conflicts of interest. The Company cannot assure a member that no other conflicts of interest will arise in the future.

## XI.    Additional Capital Contributions

No additional Capital Contributions in addition to the initial contributions set forth in Schedule A shall be required to be made by the Members except as may be determined following a Required Vote of the Members ("Required Additional Capital Contributions"). Any such

Required Additional Capital Contribution shall be made in proportion to each such Member's Member Percentage.

In the event that Required Additional Capital Contributions are required pursuant to this Section and any Member fails to make his Required Additional Capital Contribution within thirty (30) business days after such determination that such Required Additional Capital Contributions are due ("Defaulting Member"), the other Members ("Lending Members") may, but shall not be obligated to, lend to the Company an amount to satisfy the deficiency so created ("Default Loan"), which Default Loan shall be made in proportion to the Member Percentages of the Lending Members or as the Lending Members shall otherwise agree. The Default Loan shall be subject to the following terms: (i) such Default Loan shall be a demand loan which shall bear interest at the highest non-usury rate permitted by law ("Default Rate"); (ii) all monies paid as repayment of such Default Loan shall first be applied to the costs and expenses of the Lending Member(s), including attorneys' fees and costs with respect to such Default Loan, secondly towards accrued and unpaid interest, and finally towards the outstanding principal balance; (iii) interest on the Default Loan shall be due and payable monthly and all such interest shall be paid by the Company, but shall be an obligation of the Defaulting Member and constitute a distribution to such Defaulting Member, which shall be offset against any future distributions to which the Defaulting Member may otherwise be entitled to under this Agreement; and (iv) the Default Loan may be called in whole or in part anytime.

In the event the Lending Members shall make the Default Loan and in the further event that the Defaulting Member shall have failed to fully cure the Default hereunder by paying the Default Loan, together with interest thereon at the Default Rate from the date such Default Loan was due until the date of the election by the Lending Members to take advantage of the provisions of this Section, the Lending Members shall have the right (which shall only be elected in writing) to convert all or any portion of the Default Loan (including interest which has accrued thereon) to the capital of the Company, whereupon the Member Interests of the Lending Members shall be proportionately and permanently increased and the Member Interest of the Defaulting Member shall be proportionately and permanently reduced. Notwithstanding anything contained herein to the contrary, the Lending Member shall give the Defaulting Member three (3) days' written notice of its intention, during which time the Defaulting Member shall have the right to satisfy in full the then outstanding principal balance, together with any accrued but unpaid interest, of the Default Loan owing to the Lending Member.

In the event that the Lending Members shall determine to convert all or any portion of the Default Loan to the capital of the Company, the Member Interests of the Lending Members and the Defaulting Member shall be redetermined pursuant hereto so that each Member's redetermined Member Percentage shall be equal to the product of the total Member Percentages of the Lending Members and the Defaulting Member, and a fraction, the numerator of which shall be equal to any Capital Contributions of such Member, plus one hundred fifty percent (150%) of any Default Loans theretofore made by such Member, and the denominator of which is equal to the Capital Contributions of the Lending Members and the Defaulting Member, and one hundred fifty percent (150%) of any Default Loans theretofore made by the Lending Members. All distributions and allocations made after the conversion of a Default Loan into the capital of the Company shall be based on the new Member Percentages resulting from such conversion.

The remedies heretofore expressly set forth are in addition to and not in lieu of any and all other legal and equitable remedies that may be available to the Company and/or the Lending Members in the event of a default by the Defaulting Member. With respect to the foregoing remedies, the Lending Members and the Company shall have the right to pursue same on a cumulative basis, no action seeking any single remedy constituting an election or in any

# Exhibit "I"

## For Memorandum of Membership Interest

Between, DFRF Enterprises LLC, Address:129 Concord St. Suite 25
Framingha MA 01702   US Telephone: +1 (888) 382-6452, E-mail: info@dfrfenterprises.com,
represented by its Manager, Veliton Marcos Pereira                                    BR Citizen,
Passport #        YA713479              , Party "A";

And



address at
US          Citizen,
Telephone:                      , email:

I.      Special Terms and Conditions:

    a.  This Membership Interest will be considered valid after Party "B" completes
        the follow steps:

        a.1. Activate the MIPA account(s) by depositing a credit in the amount of
        U.S.D. $1,000.00      (one thousand                  United States
        Dollars) in the coordinate below:

| | |
|---|---|
| Bank Name: | **CITIZENS BANK** |
| Bank Address: | **28 STATE STREET, BOSTON, MA 02109** |
| SWIFT Code: | |
| ABA/Routing # | |
| Account Number: | |
| Beneficiary Name: | **DFRF Enterprises LLC** |
| Address: | **60 STATE STREET SUITE 700 , BOSTON, MA 0219** |

        a.2. Upon confirmation that the above step have been completed, the
        Membership Interest Private Agreement will be valid.

    b.  Term: twelve (12) months and can be renewable, within five days prior to the
        end of each month period, one of the parties requests in writing the desire to
        renew the contract at the end of said month period.

    c.  Interest rate (Variable): Up to fifteen percent (15%) per month, subject to
        ownership, production, availability and marketing fluctuations.

    d.  Repayment of the participation, plus any interest and/or returns, shall be paid
        monthly or as per agreed.

    e.  Party "A" will be responsible for payment of introduction fees, commissions
        and general fees payable to any third parties who may participate in this
        Agreement.

    f.  The Membership can be terminated at any time. However, the following
        terms apply:

        f.1 Upon written notice to Party A, Party B has the right to terminate this
        Agreement at any time. In the event Party B request termination of this
        agreement prior complete 30 (Thirty) days of registration, may not withdraw

DFRF ENTERPRISES LLC PRIVATE PLACEMENT MEMORANDUM

agreement prior complete 30 (Thirty) days of registration, may not withdraw more than Eighty Five percent (85%) of the original amount participated. And upon the expiration of said four months period, Party B shall not be entitled to any returns and or return participation that may have accrued during said first two weeks period. Upon proper termination of this Agreement, and the required written notice pursuant to this Section, Party A will honor Party B's request and refund up to Eighty Five percent (85%) of Party B's original participation within five (5) international banking days after the expiration of the first four months of the term of this Agreement.

1.2. Upon written notice to Party A, Party B has the right to terminate this Agreement within fifteen (15) days of the expiration of the first two weeks period of the term of this agreement. In that event, Party B may not withdraw more than Eighty Five percent (85%) of the original amount participated, and may withdraw pro-rate return in the first period of two weeks. And Party B shall not be entitled return that may have accrued during the second period of four months. Upon proper termination of this Agreement, and the required written notice pursuant to this Section, Party A will honor Party B's request and refund up to Eighty Five percent (85%) of Party B's original participation and the pro-rate interest earned during the first two weeks within five (5) international banking days after the expiration of the second four months period of the term of this Agreement.

1.3. Party A can terminate this Agreement anytime due to technical, operational, legal, natural, financial or any other reasonable reason that may terminate Party A's ability to operate. In addition, this Agreement shall be considered immediately terminated in the event any party becomes legally incapable of performing the terms of this Agreement.

II.   Dispute Resolution

   a. In the event of any disputes that may arise during the performance of this Agreement, the venue shall be the Court of Massachusetts, USA.


VELITON M. PEREIRA
_____                              _____
          Signature                                             Date
Veliton Marcos Pereira                    - MGR
DFRF Enterprises LLC (Party "A")


_____                              _____
          Signature                                             Date
                        (Party "B")

# Certificate of Membership

this certifies that

Register as Member # _____ with good standing with

## *DFRF Enterprises LLC*

Giving this 10 day of October in the year 2014



PENGAD 800-631-6989

EXHIBIT

_____
**MGR**
**Veliton Marcos Pereira**

_____
**MGR**
**Jaime de Jesus Recarey**

*"...approve things that are excellent..."*

*Accedium*

Accedium UK. Limited
148 Leadenhall Street.
London, EC3V 4QT United Kingdom

Ref.: BOND No.: AIC100009IB/MA2-00000194/1-111214
Underwriter Accedium / AON Canada
Mr. Hugh Telephone Number: +1 647 801 6825

G.F. OR FILE No.:

Company Name: DRFR Enterprises LLC.
Located: Arbor House.
James Street, Bridgetown,
St. Michael, BB11133, Barbados, W.I
101 Federal St # 1600, Boston, MA 02110

| | |
|---|---|
| Issue Date : | November 12,2014 |
| Effective Date: | September 01, 2014 |
| Expires Date: | September 01, 2015 |

| | |
|---|---|
| Beneficiary: | Nubia Rodrigues Goulart |
| Located: | 246 Winthrop St. Framingham, MA 01702 |

LIMIT OF LIABILITY: USD$1.000.00 (United Sates Dollars)

**INSURER: Accedium UK Limited.**

This Insurance Indemnity Bond is made and entered into by and between Accedium UK Limited. (hereinafter referred to as the "INSURER" and/or "(THE INSURER)" and DFRF Enterprises, LLC hereinafter referred to as the "COMPANY" for the benefit of Mr. / Mrs Nubia Rodrigues Goulart hereinafter referred to as the "BENEFICARY"

**WITNESETH**

WHEREAS the COMPANY AND BENEFICIARY desires INSURER to act as INSURER at COMPANY and BENEFICIARY up to the principal amount of One Thousand United States Dollars (USD$1.000.00)

WHEREAS, INSURER is willing to acts as INSURER for the benefit of BENEFICIARY, subject to the provision hereof; and NOW THEREFORE, FOR THE PREMIUM AND CONSIDERATION RECEIVED, including the premises and mutual covenants herein set forth, INSURER does hereby agree to indemnify the BENEFICIARY up to the limit of liability as stated herein.

**LET ALL MEN KNOW BY THESE PRESENTS**

In consideration of the BENEFICIARY providing funds in the principal amount of One Thousand United States Dollars (USD$1.000.00), subject, however, to the condition that prior to the date of the advance of the funds to the COMPANY that we, INSURANCE COMPANY, issue an irrevocable Insurance Indemnity BOND for any and all of the obligations that the COMPANY may have to the BENEFICIARY arising out of or in connection with the Membership Agreement entered into between the BENEFICIARY and the COMPANY in the principal amount of One Thousand United States Dollars (USD$1.000.00), we the undersigned INSURANCE COMPANY hereby declare:

**GENERAL TERMS AND CONDITIONS**

1.  In the event of the COMPANY failing to return to the BENEFICIARY any amount due subject to the terms and conditions of the attached Membership Agreement, the INSURER undertakes irrevocably to indemnify the BENEFICIARY for one hundred percent (100%) of the unpaid eligible principal amount plus reasonable interest and expenses due at the time of default.

2.  Upon the occurrence of default, the BENEFICARY shall be entitled to make a claim under this Bond in respect of the principal amount due arising by reason of such default and the INSURER shall pay to the BENEFICIARY one hundred percent (100%) of the principal amount plus reasonable interest and expenses due within a reasonable and customary period of time from the receipt of a demand from the BENEFICIARY stating the reason for such demand.

3.  The COMPANY and the BENEFICIARY shall provide all relevant documents deemed necessary by the INSURER in order to process the claim.

4.  The INSURER hereby agrees that the valid claim demand made by the BENEFICARY, which shall contain confirmation that the required payment has not been paid by the COMPANY according to the terms and conditions of the subject Membership Agreement will be considered by the INSURER as adequate proof of default.

5.  Where fraud, criminal act or misrepresentation has been alleged on the part of any of the parties to the bond including but not limited to the COMPANY or the BENEFICIARY this Bond will become null and void.



*Accedium*

## SUBROGATION

Upon payment of any claim under this Bond, the INSURER shall be subrogated to the BENEFICIARY's rights under the terms of the Membership Agreement in the BENEFICIARY's possession. The BENEFCIARY shall execute and deliver at the request of the INSURER all instruments and transfer and assign such rights where legally possible. The cost of such transfer and Assignment shall be borne by the INSURE. The execution by the BENEFICIARY of a release or waiver of the right to collect under the Agreement shall equally release the INSURER from any further obligation under this BOND. INSURER shall be subrogated to the rights of the BENEFICIARY under the Agreement to the extent of the claim payments made directly by the INSURER to the BENEFICIARY.

## MISCELLANEOUS PROVISIONS

(a) Transfer of Interest: Transfer of the COMPANY's obligation under the Membership Agreement shall not be permitted by the BENEFICIARY.

(b) In the event of any lawsuit proceeding for breach of or to enforce any term or terms of this Insurance Indemnity Bond, the prevailing party in such proceedings shall be entitled to recover, in addition to any other recovery, its costs of suit and reasonable attorney's fees.

## PREMIUM AND CONSIDERATION

(a) Warranted the COMPANY shall pay directly to the INSURER the premium and consideration at the onetime premium by bank-to-bank wire transfer prior to execution and issuance of this INSURANCE INDEMNITY BOND. The insurance coverage provided by this INSURANCE INDEMNITY BOND shall be null and void and without effect, unless such premium and consideration is received directly by the INSURER as required.

(b) All amounts received by the INSURER as an application fee, shall be fully credited against the amount due in sub-article (a) hereinabove.

(c) Payment and receipt of any and all premium and consideration due when due to the INSURER that is paid to any broker, agent, intermediary or representative does not constitute due payment and receipt of said premium and consideration to the INSURER.

(d) The premium and consideration is fully earned by the INSURER upon the execution and issuance of this INSURANCE INDEMNITY BOND and is non-refundable.

## SPECIFIC TERMS AND CONDITIONS

Consequently, we the undersigned insurance company, hereby irrevocably, as surety, undertake to pay the BENEFICIARY, irrespective of the effects of the above mentioned Membership Agreement, any amount up to the maximum principal amount of One Thousand United States Dollars (USD$ 1.000.00).

A. Upon receipt of the BENEFICIARY'S written and duly signed demand accompanied with BENEFICIARY'S attestation certifying that the COMPANY has not fulfilled their obligation towards the BENEFICIARY under said Membership Agreement when due, detailing the outstanding amount of principal, interest, costs and expenses.

B. This present "Insurance Indemnity Bond" is valid until the expiry date, after which date, it will automatically become null and void if not renewed or, if no claim has reached THE INSURER on or before the expiry date (at the close of business 5:00 PM)

C. Each payment effected by COMPANY under this present INSURANCE INDEMNITY BOND and any and all financial agreement attached hereto whether by reference or attachment hereafter, will automatically reduce INSURER'S liability towards the BENEFICIARY accordingly.

D. This INSURANCE INDEMNITY BOND is subject to the laws and courts of England and Wales.

E. The BENEFICIARY shall not be bound to exhaust its recourse against the COMPANY or others or any securities or other guarantees it may at any time hold before being entitled to payment from the INSURER and the INSURER renounces all benefits of execution and division.

F. All sums payable by the INSURER hereunder shall be paid free and clear and without any deduction or withholding for or on account of any payment of future taxes, imposts, duties, charges or withholding of any nature whatsoever and if the INSURER shall be required by law to make any withholding or deduction from any payment hereunder, then the INSURER shall pay to the BENEFICIARY such additional amount as will result in the



receipt and mention by the BENEFCIARY (free from liability in respect of any such deduction or withholding) of the full amount which would have otherwise been receivable had no such deduction or withholding been made.

G.   If for the purpose of obtaining judgment in any court or for any other purpose hereunder, it is necessary to convert and amount due hereunder in the currency in which it is due ("The Original Currency") into another currency ("The Judgment Currency"), the rate of exchange applied shall be that at which in accordance with normal banking procedures, the BENEFICIARY could purchase, in the London foreign exchange market, at the BENEFICARY's option, the original currency with the judgment currency on the date two business days preceding that on which judgment is given. The INSURER agrees that its obligation in respect of any original currency due from it to the BENEFCIARY shall, notwithstanding any judgment or payment in such other currency, be discharged only to the extent that, on the business day following receipt of any sum as paid or adjudged to be due hereunder in the judgment currency, the BENEFCIARY may, in accordance with normal banking procedures purchase in the London foreign exchange markets, the original currency with the amount of the judgment currency so paid or so adjudged to be due; and, if the amount of the original currency so purchased is less than the amount originally due in the original currency, the INSURER agrees as a separate obligation and notwithstanding any such payment or judgment to indemnify the BENEFICIARY against such loss.

H.   Should the BENEFICIARY make demand upon the INSURER and the INSURER'S liability as referred to herein is not paid, the INSURER agrees that it will, in addition to any other amount referred to herein, be liable for the payment of reasonable costs of recovery (including all reasonable attorney's fees on an attorney / client basis and disbursements) incurred by the BENEFICIARY in connection with the enforcement of the INSURER'S obligation hereunder.

I.   Without prejudice to or any way limiting or lessening the INSURER'S liability, the BENEFICIARY may grant time, renewals, extension, indulgences, releases and discharges to and accept compositions from or otherwise deal with the COMPANY and others, including the INSURER and any other insurer as the BENEFICIARY may see fit, and the BENEFICIARY may take, abstain from taking or perfecting, vary exchange, renew, discharge, give up, realize on or otherwise deal with securities and guarantees in such a manner as the BENEFICIARY may see fit, and the BENEFICIARY may apply all moneys from the COMPANY or from securities or guarantees upon such parts of the guaranteed liabilities as the BENEFCIARY may see fit and charge any such application in whole or in part from time to time.

J.   This INSURANCE INDEMNITY BOND shall be binding upon the INSURER and shall not be considered satisfied by any intermediary payment of the whole or any part of any sums at any time due or remaining unpaid to the BENEFICIARY. This surety is intended to secure all obligations of the COMPANY to the BENEFCIARY arising from time to time under the Membership Agreement attached hereto and made a part hereafter and the INSURER consents to the making of multiple demands by the BENEFICARY under this single INSURANCE INDEMNITY BOND should the COMPANY default under the terms of the subject Membership Agreements on multiple occasions.

### WHERE NOTICE IS GIVEN

All notices, pleadings, claims, requests, demand and other communications required to be given by the parties hereto shall be in writing and shall be deemed to have been given: (a) on the date of service, if served personally or by readable electronic means prior to the close of normal business hours on a normal business day, (b) the opening of the next business day, if served personally or by readable electronic means after the close of normal business hours on a normal day, (c) on the date of receipt if by courier service.

Notices to the INSURER shall be addressed as follows:

Accedium UK Ltd. /
Address 1. – 148 Leadenhall Street, London, EC3V 4QT, UK.
Tel: +44 (0) 207 764 0749, Fax: +44 (0) 203 008 4795
Address 2. - Arbour House, James Street- Bridgetown. St. Michaels, Barbados, 11133
Tel: +1 (246) 228 1691, Fax: +1 (246) 429 1924

Notices to the BENEFCIARY shall be addressed as follows:

Nubia Rodrigues Goulart
246 Winthrop St. Framingham, MA 01702

Notices to the COMPANY shall be addressed as follows:

DFRF Enterprises LLC.
Address 1.- 2450 Dahlgren Way – Winter Garden FL. 34787. USA
Address 2. – 101 Federal ST, # 1600, Boston, MA, 02110



**VENUE OF ACTION**

This Insurance Policy shall be governed by and construed in all respects in accordance with the laws of the Courts of England and Wales. Any dispute under this BOND or arising out of it shall be decided under and pursuant to the laws of the Courts of England and Wales. Venue of any action or proceeding hereunder shall be in England and Wales. The BENEFICIARY and COMPANY agree that he, she or it will submit to the general jurisdiction of the courts herein under this sections and will comply with all requirements necessary to give such court jurisdiction and that service of process in such suit may be made upon the parties hereto at the names and addresses listed under the notices Section contained herein.

IN WITNESS WHEREOF, INSURANCE COMPANY, BOND AND INSURANCE POLICY TO BE EXECUTED AND ISSUED THIS DATE: NOVEMBER 12,2014 BY A DULY AUTHORIZED SIGNATORY, BUT THIS INSURANCE INDEMNITY BOND SHALL NOT BECOME VALID UNTIL THE AGREED PREMIUM AND CONSIDERATION IS RECEIVED BY THE INSURANCE COMPANY AND A TRUE COPY OF ANY AND ALL MEMBERSHIP DOCUMENTS AND/OR AGREEMENTS ARE RECEIVED BY INSURANCE COMPANY BY COURIER SERVICE AND ATTACHED HERETO AND MADE A PART OF HEREAFTER.

**Accedium Insurance Company Limited.**

Authorized Signatory
Ref: Master Bond# AIC100009IB
Executed on Monday, August 25, 2014
Effective Date on: Monday, Sept 01, 2014
Assigned Today: November 12, 2014